IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 9, 2005 Session

# CRAIG ALAN DUNN v. MATRIX EXHIBITS, INC.

**Appeal from the Chancery Court for Davidson County**
**No. 99-3205-III       Ellen Hobbs Lyle, Chancellor**

---

**No. M2003-02725-COA-R3-CV - Filed October 13, 2005**

---

In this suit by an employee, Craig Dunn, against his former corporate employer, Matrix Exhibits, Inc., for breach of written employment contract, the trial court entered judgment for Dunn based upon a finding Matrix anticipatorily breached the employment agreement. The trial court awarded Dunn three of six categories of damages he sought but denied the other claimed damages based upon a finding Dunn's proof of the amount of such damages was speculative. Both parties appealed. Finding Matrix in actual breach of the employment contract, we affirm the award of damages for moving expenses, car allowance, and salary, but reverse the finding that Dunn's proof of damages for 5% of Matrix' value was too speculative, and award Dunn an additional $282,500. We affirm the trial court in all other respects.
.
**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed in Part and Reversed and Modified in Part**

FRANK G. CLEMENT, JR., J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and PATRICIA J. COTTRELL, J., joined.

C. Bennett Harrison, Jr. and Brian W. Holmes, Nashville, Tennessee, for the appellant, Craig Alan Dunn.

Paul W. Ambrosius and W. Justin Adams, Nashville, Tennessee, for the appellee, Matrix Exhibits, Inc.

## OPINION

Craig Dunn was Director of Operations for CDA Industries in Duluth, Georgia, a competitor of Matrix Exhibits, Inc. of Brentwood, Tennessee, when he was recruited by Matrix to become its Director of Operations. Following negotiations with Louis Tapia, owner and CEO of Matrix, and

Doug Hughes, Matrix' then President,[1] Dunn and Matrix entered into a formal written employment contract for an initial term of three years. Pursuant to the contract, Dunn joined Matrix in November of 1997 serving as its Director of Operations.

The employment contract provided six categories of compensation that are relevant to the issues. The contract provided that at the end of the three-year term, Dunn would acquire, as deferred compensation, 5% ownership of the corporation, Matrix Exhibits, Inc.[2] The contract also afforded Dunn an annual starting salary of $75,000, a 3% commission on sales of all retail banking or similar production in which Dunn actively participated, a 1% bonus on the first $1,000,000 of recast earnings,[3] and a 5% bonus on the variable recast earnings.[4] Dunn contends his primary motivation for accepting employment with Matrix was the promise of ownership, which was not available to Dunn at CDA.

While Dunn served as Director of Operations for Matrix, the corporation experienced an increase in profits. Dunn, however, began to experience problems with Tapia. Dunn contends Tapia had represented that he intended to remove himself from the day-to-day operations of the company so that he and his wife, Jan, who was actively involved in the operation of Matrix, could "retire." However, contrary to his representations to Dunn, neither Tapia nor his wife removed themselves from the operation of the business. To the contrary, both continued to maintain a very active role in the day-to-day operations of Matrix, and Dunn contends their involvement interfered with his efforts to do his job and negatively impacted employee morale.

Though Tapia's continued involvement in Matrix provided some consternation to Dunn, it did not initially interfere with Dunn's fulfillment of his duties to Matrix. However, that changed dramatically following a meeting between Dunn and Tapia on August 11, 1998. On that day, Tapia called Dunn to a meeting at his house during which he informed Dunn that he wanted to renegotiate the employment contract with Dunn so as to remove Dunn's deferred compensation, the ownership opportunity. After taking some time to think it over, Dunn declined to renegotiate the contract

---

[1] Doug Hughes was also a former employee of CDA in Duluth. At CDA, he was Dunn's supervisor. Matrix first recruited Hughes to serve as its President, and then Tapia and Hughes recruited Dunn. Hughes experienced a similar situation as Dunn regarding the breach of his employment contract, and his case against Matrix was at one point consolidated with Dunn's. Presently, however, this case is only between Dunn and Matrix.

[2] Per the employment contract, a deferred compensation unit meant, "a unit with right to a share of the equity of Matrix Exhibits, Inc., equal to 1%." Tapia had recruited Hughes to come to work for Matrix under a similar scheme whereby Hughes, who became President of Matrix, would acquire, as deferred compensation, 15% ownership. Throughout this opinion, we will occasionally refer to the value of 5% of Matrix simply as "deferred compensation".

[3] Per the employment contract, recast earnings meant, "Net Profit as defined herein, plus depreciation, interest, current shareholders compensation and benefits." The net profit was to be determined by combining the profits of Matrix and another corporation, Pyramid Exhibit Management, Inc., also owned by Louis Tapia.

[4] Per the employment contract, variable recast earnings meant, "the actual recast earnings for each year or other applicable period, less the standard recast earnings."

insisting that it be honored, that he continue in his current position, and realize the 5% ownership of Matrix at the end of the three-year period.

Following this discussion, the relationship between Tapia and Dunn deteriorated dramatically. Dunn contends Tapia took various actions against him, which included removing Dunn's Rolodex from his office, having Dunn's mail reviewed prior to Dunn seeing his mail, and changing the security code to Dunn's voice mail thereby preventing Dunn from retrieving his phone messages, all of which impaired Dunn's ability to perform his job. As the relationship continued to deteriorate and Dunn became more paranoid of Tapia's actions and motives, Tapia ordered Dunn to travel to France to serve as "paymaster" for Matrix at an exhibit show.[5] Knowing that the previous paymaster had been accused of embezzlement by Tapia and then fired, Dunn refused to go. Shortly thereafter, on or about September 1, 1998, Tapia terminated Dunn's employment with Matrix.

Dunn filed this action against Matrix[6] for breach of the employment contract seeking compensatory and punitive damages. Matrix answered and counterclaimed for breach of contract and unjust enrichment. The trial court found that Matrix had anticipatorily breached the employment contract and awarded Dunn compensatory damages for moving expenses, car allotment, and a portion of his salary, totaling $85,559.16. The court denied Dunn's other claims for compensatory damages and his claim for punitive damages.[7]

## STANDARD OF REVIEW

The standard of review of a trial court's findings of fact is *de novo,* and we presume that the findings of fact are correct unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999). Where the trial court does not make findings of fact, there is no presumption of correctness, and we "must conduct our own independent review of the record to determine where the preponderance of the evidence lies." *Brooks v. Brooks*, 992 S.W.2d 403, 405

---

[5]Matrix was an exhibit company. It prepared exhibits and advertising displays, and its employees traveled to various shows to set up these exhibits and advertising displays for their clients. The paymaster for a show carried all the cash to pay the vendors and workmen that would work on-site at the show. As paymaster, Dunn would have been responsible for carrying and allocating thousands of dollars in cash to pay temporary labor for their services to assemble and disassemble Matrix' exhibits.

[6]Tapia was initially a co-defendant, however, during trial, Plaintiff announced a nonsuit of its claims against Tapia individually, leaving only Matrix Exhibits, Inc. as a defendant.

[7]As for the counterclaim by Matrix, the court found that Dunn also breached the employment contract but determined that Dunn's breach occurred after Matrix committed the anticipatory breach. The court determined that Dunn's breach would not serve as a bar to his recovery of damages.

(Tenn. 1999). We also give great weight to a trial court's determinations of credibility of witnesses. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997); *B & G Constr., Inc. v. Polk*, 37 S.W.3d 462, 465 (Tenn. Ct. App. 2000). Issues of law are reviewed *de novo* with no presumption of correctness. *Nelson v. Wal-Mart Stores, Inc.*, 8 S.W.3d 625, 628 (Tenn. 1999).

### BREACH OF CONTRACT

This appeal concerns whether Matrix breached the employment contract and the appropriate measure of damages stemming from that breach, if any. We first address the breach of contract. Each party alleges that the other breached the contract. The trial court found that Matrix anticipatorily breached the employment contract. We affirm the finding that Matrix breached the contract but find its breach was actual instead of anticipatory.

To serve as an anticipatory breach of contract, the words and conduct of the contracting party must amount to a total and unqualified refusal to perform the contract. *Wright v. Wright*, 832 S.W.2d 542, 545 (Tenn. Ct. App. 1991) (citing *Brady v. Oliver*, 147 S.W. 1135 (1911) and *Kentucky Home Mutual Life Ins. Co. v. Rogers*, 270 S.W.2d 188 (1954). The trial court found that Tapia "was not that explicit," referring to the manner by which he expressed his intentions to perform, or not perform pursuant to the employment contract. While we agree that Tapia was not that explicit, Matrix, through an accumulation of Tapia's actions, breached the duty of good faith and fair dealing in the performance of the employment contract, and Matrix, therefore, was in actual breach of contract.

In Tennessee, "there is implied in every contract a duty of good faith and fair dealing in its performance and enforcement. . . ." *TSC Industries, Inc. v. Tomplin*, 743 S.W.2d 169, 173 (Tenn. Ct. App. 1987). This duty extends to the performance and enforcement of employment contracts. *See Hooks v. Gibson*, 842, S.W.2d 625, 628 (Tenn. Ct. App. 1992). Parties to a contract are bound "to act in word and deed, in a responsible manner." *Williams v. Maremont Corporation*, 776 S.W.2d 78, 81 (Tenn. Ct. App. 1992) (citing Gibson's Suits in Chancery, 6th Edition, § 34). Thus, Matrix and Dunn were bound to conduct themselves in a manner consistent with the obligations they assumed. Moreover, they implicitly undertook a good faith duty to not intentionally or purposefully do anything that would have the effect of "destroying or injuring the right of the other party to receive the fruits of the contract." *Winfree v. Educators Credit Union*, 900 S.W.2d 285, 289 (Tenn. Ct. App. 1995) (citing 17 AM.JUR.2D CONTRACT*S* § 256 (1964)).

The trial court found that Matrix, through Tapia, formed the intention not to perform its obligation to provide Dunn an ownership interest in Matrix, which intention Matrix manifested through Tapia's purposeful interference with Dunn's performance of his duties. Specifically, the trial court found that Matrix manifested its intention not to perform its contract obligations at the August 11, 1998, meeting at Tapia's home and that Tapia thereafter "acted on his determination not to provide the plaintiff an ownership opportunity in MATRIX."

-4-

Mr. Tapia interfered with the plaintiff's performance of the job: Mr. Tapia had the plaintiff's mail opened, the plaintiff's Rolodex with client contacts were [sic] taken from his office at Mr. Tapia's direction, the plaintiff's Day Timer with client information was removed from his office at Mr. Tapia's direction . . . .  Mr. Tapia had no intention of performing his obligation to allow the plaintiff to earn an ownership interest in the company and Mr. Tapia acted to thwart the plaintiff from achieving such an interest.

These actions constituted intentional efforts to obstruct Dunn's opportunity to "receive the fruits of the contract." *See Winfree,* 900 S.W.2d at 289.  These actions, coupled with Tapia's express desire at the August 11, 1998, meeting to renegotiate Dunn's contract by removing the ownership provision, constituted an actual and material breach of contract by Matrix through Tapia.

Matrix' actual breach of the employment contract preceded the final conflict between Tapia and Dunn, which involved a trade show in France for which Matrix was responsible.  Tapia ordered Dunn to go to the show in France and serve as paymaster for the show.  Tapia insisted that Dunn go even though, as found by the trial court, "Mr. Tapia knew [Dunn] did not like going to France," and "Mr. Tapia knew [Dunn] did not want to be charged with the task of paymaster after the recent embezzlement."[8]  Dunn refused to go to France due to Tapia's poorly disguised efforts to sabotage Dunn.  The trial court saw the paymaster incident as more "evidence that Mr. Tapia was making the plaintiff's performance of his job as difficult as possible to thwart the plaintiff earning ownership." The trial court characterized Dunn's refusal to go to France as a breach of the employment contract by Dunn; however, it found that Dunn's breach did not serve as a bar because Matrix had previously breached the contract.

"In cases where both parties have not fully performed, it is necessary for the courts to determine which party is chargeable with the first uncured material breach." *McClain v. Kimbrough Construction Company, Inc.*, 806 S.W.2d 194, 199 (Tenn. Ct. App. 1991).  A party to a contract may be excused from performing its remaining obligations by a previous, uncured material breach of the other party.  *See generally McClain; see also United Brake Systems, Inc. v. American Environmental Protection, Inc.,* 963 S.W.2d 749 (Tenn. Ct. App. 1997).

Dunn's refusal to go to France to serve as paymaster was subsequent to the  material breach of the employment contract by Matrix.  Moreover, though Dunn's refusal to go to France could constitute a breach, it was substantially less significant than the breach by Matrix and understandable given Tapia's egregious conduct.  Whether Dunn's refusal to go to France constituted a breach of the employment contract, Dunn's breach was excused because it was subsequent, and it paled in

_____

[8]The previous paymaster for the trade show in France was accused of and terminated for embezzling a portion of the cash that he had been given, and Dunn feared that Tapia's insistence that he go to France was an effort to set him up for embezzlement.  The trial court found there was insufficient evidence to prove a set-up. We do not disagree with the finding; nevertheless, we recognize this to be Dunn's reason for not going to France as paymaster.

comparison to Matrix' previous, uncured material breach of the employment contract. Thus, we now turn to the issue of damages.

## DAMAGES

Given the material breach by Matrix, Dunn is entitled to recover his damages. The employment contract afforded Dunn an annual salary, moving expenses, car allotment, bonuses, commissions and deferred compensation of 5% of the equity of Matrix after three years. Dunn's salary for the first year of employment was $75,000, which was to be increased to $85,000 if the combined sales of Matrix and a sister company, Pyramid Exhibit Management Company, Inc., exceeded $7,250,000. The trial court awarded Dunn a total of $85,559.16 as damages for his salary, moving expenses and car allotment but denied Dunn's claim for deferred compensation, bonuses, and commissions, finding the proof of such damages too speculative.[9]

Dunn contends the trial court erred by denying damages for deferred compensation, bonuses, and commissions. We affirm the award of $85,559.16 as damages for Dunn's salary, moving expenses and car allotment. We also affirm the trial court's denial of damages for commissions and bonuses. We, however, reverse the decision to deny Dunn's claim for deferred compensation, finding the proof Dunn presented sufficient evidence to justify an additional award of $282,500.

### DEFERRED COMPENSATION - 5% EQUITY OF MATRIX

The employment contract provided three categories of compensation for Dunn's services to Matrix, one of which was in the form of deferred compensation. Section 4(c) provided: "At the end of three years, Dunn will be given, at no cost, five Deferred Compensation Units." In Section 4(c)(1)(F), the term "Deferred Compensation Unit" is defined as:

> [A] unit with right to a share of the equity of Matrix Exhibits, Inc., equal to 1%. The holder of each Deferred Compensation Unit will get a 1% share of the net proceeds and/or other property of any sale or other disposition of the corporate business or ownership of Matrix.

The trial court declined to award Dunn damages for the value of the five deferred compensation units "because of the speculative value of the company."

Speculative damages may not be recovered where the fact of damage is uncertain, contingent or speculative. *See Pinson & Associates Insurance Agency, Inc. v. Kreal*, 800 S.W.2d 486, 488 (Tenn. Ct. App. 1990) (citing *Maple Manor Hotel, Inc. v. Metropolitan Govt. of Nashville and*

---

[9]Dunn's contract provided for a salary of $75,000 that would be increased to $85,000 if the combined sales of Matrix and Pyramid exceeded $7,250,000. The trial court found the evidence of a $7,250,000 value for those companies too speculative and awarded Dunn lost salary for September 1, 1998, through November 30, 2000, at a rate of $75,000 per year less the salary he was earning at his new job. Dunn argues on appeal he was entitled to the $85,000 salary.

*Davidson County*, 543 S.W.2d 593 (Tenn. Ct. App. 1976)). However, while uncertain and speculative damages are prohibited when the *existence* of damage is uncertain, they are not necessarily prohibited when the *amount* is uncertain. *Cummins v. Brodie*, 667 S.W.2d 759, 765 (Tenn. Ct. App. 1984) (emphasis added). When the existence of damage is certain "mathematical certainty is not required." *Id*. (quoting *Coverdell v. Mid-South Farm Equipment Assoc., Inc*., 335 F.2d 9, 14 (6th Cir. 1964).

> The courts will allow recovery even if it is impossible to prove the exact amount of damages from the breach of contract. Otherwise, in certain instances, the courts would be powerless to help some wronged parties. "Exact justice is not always attained, and the law does not require exactness of computation in suits that involve questions of damages growing out of contract of tort." *Provident Life and Accident Ins. Co. v. Globe Indemnity Co.*, 156 Tenn. 571, 576, 3 S.W.2d 1057 (1928). In *Coverdell v. Mid-South Farm Equipment Assoc., Inc*., 335 F.2d 9 (6th Cir. 1964), the court applied Tennessee law to determine that an insurance company agent who was informed by trustees of the defendant corporation that he had been hired under a personal service contract to organize their group insurance, worked an entire weekend on the project, and cancelled an appointment in Texas was damaged when the trustees gave the contract to another agent. Uncertain and speculative damages are prohibited only when the existence of damage is uncertain, not when the amount is uncertain. When there is substantial evidence in the record and reasonable inferences may be drawn from that evidence mathematical certainty is not required. *Id*. at 14.

*Cummins*, 667 S.W.2d at 765. The fact Dunn sustained deferred compensation damages is not speculative. The employment contract expressly provided for Dunn to be given, at no cost, five deferred compensation units at the end of the three-year term. With the existence of Dunn's damage certain, the question becomes whether the proof in this case is sufficient to "make a fair and reasonable assessment of damages." *Pinson* 800 S.W.2d at 488 (citing *Wilson v. Farmer's Chemical Association*, 444 S.W.2d 185, 189 (Tenn. Ct. App. 1969).

In *Pinson*, evidence that the renewal rate for benefits insurance[10] was approximately 90% annually, and evidence showing the amount of commissions an agent earned in one year was deemed by the trial court sufficient evidence to award damages for "amounts that could be expected to accrue over the next ten years." This court affirmed that decision over the defendant's argument that "any or all of the policies may be cancelled at any time," and "[i]f that happens, the plaintiff will get a windfall and [the defendant] will have paid a judgment for which he should not have been liable." 800 S.W.2d at 488. This court found the evidence sufficient reasoning "the uncertainty in arriving at the proper amount of the judgment in this case is no greater than the uncertainty that exists in many cases involving future events or lost opportunities." *Id*.

---

[10]Benefits insurance was a specific type of insurance sold by the broker in this case.

-7-

The proof in the record is sufficient to make a reasonable assessment of the value of the five deferred compensation units in November of 2000.[11] In the inducement letter to Dunn in the fall of 1997, Matrix represented its value to be $5,650,000, and the "present value of the 5% shares is $282,500.00."[12] Further, at some time after Dunn joined Matrix in 1997, the shares of Matrix owned by Eddie Tapia, who owned 10% of Matrix' shares, were redeemed by Matrix for "at least" $500,000, if not more.[13] In 1998, Tapia represented that Matrix had "a base of about $5,000,000 in sales per year with an average profit of over $1,100,000." Additionally, the financial statements provided by outside accountants for the fiscal year ending June 30, 1998, showed earned revenues for Matrix of $5,471,603. For the years subsequent to 1998, the evidence presented at trial included various valuations and projections. In a letter dated August 12, 1998, from Tapia to a potential purchaser of Matrix, he projected year-end sales of $8,000,000 for 1999, $10,000,000 for 2000, and $14,000,000 for 2001. He went on to represent that Dunn and Doug Hughes were "highly respected within the exhibit and retail environment industry with proven track records" and claimed they would "add over $2,000,000 in sales to Matrix/Pyramid and should add about $700,000 to the bottom line."

Matrix challenged the reliability of the value projections contending, as the trial court found, that they "reflect the plan that Mr. Hughes and [Dunn] would grow Matrix." We do not disagree with this assessment; however, the finding does not render the evidence speculative. The projections reflect the expected value of Matrix taking into account the added value of Dunn continuing to work at Matrix as the employment contract required. Admittedly, once Dunn left Matrix, the actual numbers for 1999 and 2000, whatever they may have been, would not have included the contributions of Dunn and thus would not have reflected an increase in Matrix' sales attributable to Dunn. The absence of the added value of Dunn's services, however, was not the fault of Dunn. To the contrary, it was due to the material breach by Matrix. This point is important because "[t]he purpose of assessing damages in a breach of contract suit is to place the plaintiff, as nearly as possible, in the same position he would have had if the contract had been performed." *Wilhite v. Brownsville Concrete Co., Inc.*, 798 S.W.2d 772, 774 (Tenn. Ct. App. 1990). If Matrix had not breached the contract, Dunn would have continued to work for Matrix through November 30, 2000. Thus, the projections made by Matrix and offered into evidence by Dunn, constitute sufficient evidence to calculate Dunn's deferred compensation in the form of a 5% equity ownership of Matrix.

Matrix failed to introduce evidence of its value for 1999 or 2000. Therefore, Dunn's evidence, which ironically is Matrix' own representations of its value thrown back in its face, is uncontradicted. The uncontradicted evidence includes the following: Eddie Tapia's 10% share was

---

[11]The contract provided that the contract term was for three years commencing December 1, 1997, which made the ending date November 30, 2000.

[12]The trial court found that despite having Louis Tapia's name on it, the letter was actually sent by Doug Hughes. We find this discrepancy irrelevant given that at the date of the letter, Doug Hughes was President of Matrix, thus making this a representation by Matrix regardless of whether Tapia or Hughes sent it.

[13]This was the testimony of Louis Tapia.

worth "at least" $500,000 in 1997; Matrix represented to Dunn, as an inducement for Dunn to enter into the employment contract at issue, that its value was $5,650,000 in 1997; and based upon Louis Tapia's letter to a potential buyer in 1998, sales for 2000 were projected to be $10,000,000 with profits for 2000 projected to be $2,000,000.

Therefore, the evidence in the record of the value of Matrix from 1997 is at least $5,650,000[14] with sales and profits of the two companies projected to increase steadily and significantly through 2001. We recognize the values stated in Tapia's August 12, 1998, letter were projections, however, the record contains actual values for 1997 and 1998 and projected values for 1999, 2000 and 2001. As of 1998, when the latest projections were made, Matrix had been in business for eleven years, which provided a reasonable basis for Matrix to make one and two year projections with a reasonable degree of reliability. Thus, we are not fashioning an award that requires a crystal ball to see into the future. Moreover, *Pinson* demonstrates the extent to which the courts may go to make a reasonably certain award. 800 S.W.2d 486.

Without credible evidence from Matrix to contradict that presented by Dunn, we have concluded that Matrix had a value of at least $5,650,000 as of November 30, 2000, when Dunn would have been entitled to 5% of the equity of Matrix as deferred compensation. Thus, Dunn is entitled to an additional award of $282,500 as compensatory damages for the deferred compensation units provided for in Section 4(c) of the employment contract.

BONUSES

The trial court found the recast earnings for the nine months Dunn was at Matrix were $1,963,761.58. Based on this number, the trial court awarded Dunn 1% on the first million and 5% on the remainder, which was consistent with the provisions of Dunn's contract. The trial court found, however, that this number was not sufficient to make an award for bonuses in 1999 or 2000 on the grounds that such award would be too speculative. We affirm the trial court's calculations and award of bonuses for 1997 and 1998. We also affirm the trial court's finding that the evidence was insufficient to justify an award for bonuses for the following years, 1999 or 2000.[15]

Matrix contends the trial court miscalculated the 1997 and 1998 bonuses.[16] However, a closer examination of the record reveals that its real complaint is that the trial court substantially

---

[14] This range comes from Louis Tapia's testimony that his brother's 10% share in the company was worth at least $500,000, Louis Tapia's letter to Dunn that Matrix' value was approximately $5,650,000, and Louis Tapia's letter to a potential buyer of the company that the value of the company would be $8,000,000 in 1999 and $10,000,000 in 2000.

[15] Matrix appealed contending the trial court incorrectly calculated bonuses for 1997 and 1998. Dunn appealed contending he was additionally entitled to bonuses for 1999 and 2000.

[16] Matrix also contends Dunn's bonus should be prorated since he only worked six months of the year. We find this argument wholly without merit due to Matrix' breach of the contract.

relied on exhibit 24 to award bonuses instead of financial evidence relied upon by Matrix. Like much of the evidence in the record, exhibit 24 was based upon financial information provided by Matrix. Matrix, however, complains that the financial information in exhibit 24 was not sufficiently reliable because it was subject to further review. It also contends the trial court should have given more consideration to other exhibits.[17]

The trial court was in the best position to determine the sufficiency and reliability of the evidence, especially since the reliability of much of the financial evidence hinged on whether Matrix should be excused from earlier representations of its financial success. The court specifically found: "There is reasonably certain proof of Matrix' earnings for 1998 through August of 1998. . . ." It also found "exhibit 24 . . . contains information on earnings for 1998 obtained from Matrix' accountant. Thus, because there is reasonably certain proof of earnings for 1998, bonuses for that year can be calculated."

Matrix contends that exhibit 24 failed to include "the cost side of the equation" for determining recast earnings. Dunn disputes this contention and challenges Matrix' reliance on exhibits 37 and 46. In his brief, Dunn states that if the amount in exhibit 24, upon which the trial court relied, represented only revenues then the calculated revenues based on Matrix' methodology would be "over $4.5 million less than Matrix now agrees that they were in May of 1998."[18] It is significant that Dunn contended at trial that exhibit 46 was not reliable and the trial court made a finding consistent with Dunn's assertion. The trial court found: "[Dunn] disputes Mr. Tapia's testimony and trial exhibit 46 as numbers not verified by accounting principles. The Court agrees that the records are not reliable in terms of proving the exact dollar loss of the company." The evidence in the record does not preponderate against the trial court's findings as to the relative reliability of the exhibits and financial evidence. Therefore, we affirm the trial court's calculations and the award of bonuses for 1997 and 1998.

As for Dunn's issue, which pertains to bonuses for 1999 and 2000, we recognize the similarities in the evidence provided regarding the deferred compensation and the bonuses for these two years, but the distinction lies in the language of the contract. Dunn's entitlement to the deferred compensation was certain. The contract did not place any conditions on Dunn's receipt of the deferred compensation other than the expiration of the contract term, which was set at November 30, 2000. If the contract had not been breached, Dunn would have received the deferred

---

[17]Matrix principally argued that the trial court should have placed greater emphasis on exhibits 37 and 46. Exhibit 37 was little more than a letter from Matrix' president to Plasti-Line, Inc. explaining that Matrix was "getting our financial reports back in order" which had a one-page "financial report" for May 31, 1998 attached. Exhibit 46 was a compilation of income statements for the months December 1, 1997 through June 30, 1998, in one format, and two additional months of income statements, July and August 1998, in a different format.

[18]Dunn challenges the validity of Matrix' methodology and financial figures, noting Matrix' recast earnings would be in the neighborhood of a $3,860,000 loss based upon exhibit 37 and Matrix' methodology. Dunn further challenges Matrix' financial evidence noting, in part, that exhibit 37 failed to include the entire fiscal year ending June 30, 1998, and it failed to include the months of July and August 1998 for which Dunn was entitled to be compensated.

compensation regardless of the value of Matrix. Thus, there was absolute certainty as to the existence of damage sustained by Dunn. The provision for bonuses, however, made Dunn's entitlement to bonuses conditional. Bonuses were conditional on the recast earnings exceeding $1,000,000. While the evidence presented included projections that the recast earnings would exceed $1,000,000, those projections do not serve the same purpose here as they did with the deferred compensation award. The projections in this situation are necessary to show the *existence* of damage and not merely the amount. Tennessee law does not permit an award of damages where both the existence and amount of damage is uncertain. "[S]peculative damages cannot be recovered in the sense that the fact of damage is uncertain, contingent or speculative. . . ." *Pinson,* 800 S.W.2d at 488 (citing *Maple Manor Hotel, Inc. v. Metropolitan Govt. of Nashville and Davidson County*, 543 S.W.2d 593 (Tenn. Ct. App. 1976)).

## SALARY

Dunn takes exception with the award of $34,250.10 as compensatory damages for his salary, contending he was entitled to more. His only complaint is that the trial court based this award upon an annual salary of $75,000, instead of an annual salary of $85,000 Dunn contends he would have been paid had his employment with Matrix not been wrongfully terminated.

Dunn was awarded damages through the end of the term of the contract based upon an annual salary of $75,000, reduced by his actual income for that period from his new employer.[19] The trial court made the following finding of fact relevant to this issue: "The Court finds that there is insufficient proof and that it is merely speculation whether Matrix' earnings . . . would have been sufficient to award [Dunn] . . . an $85,000 base salary."

The employment contract provided that Dunn's salary would increase from $75,000 to $85,000 if a condition precedent occurred, that being if the combined sales of Matrix and its sister company, Pyramid Exhibit Management, exceeded $7,250,000.[20] Dunn's argument that he was entitled to damages based on a salary of $85,000 was based upon on a five-year earnings history Tapia provided to him during his employment negotiations. That history reflected earnings in excess of $7,250,000 for three of five years from 1993-1997. Dunn also relied on the projections provided by Tapia to a potential purchaser in 1998, showing expected sales of $8,000,000 in 1999 and $10,000,000 in 2000.

The contract expressly provided that Dunn was entitled to receive an annual salary of $75,000 throughout the three-year term. Thus, it was certain Dunn was entitled to compensation of no less

---

[19] Dunn was fortunate to mitigate his damages by finding suitable employment.

[20] Section 4(a) of the contract provided in pertinent part:
Base Salary. During the first years of this Agreement, Matrix shall pay Dunn a base salary of $75,000 a year, . . . In subsequent years, when the combined sales of Matrix and Pyramid Exhibit Management exceed $7,250,000, the base salary will be increased to $85,000 a year. If a consecutive six month sales average exceeds $604,166, Dunn's salary will be increased to $85,000 annually.

than $75,000 annually provided he fulfilled his part of the contract, which he did. Whether Dunn would have been entitled to the increased salary of $85,000 was never certain, because it was subject to a condition precedent that never occurred. Moreover, the trial court found Dunn's evidence insufficient for it to determine whether Matrix' earnings would have been sufficient for it to award Dunn the increased salary of $85,000. We have concluded the record does not preponderate against the trial court's finding. Therefore, we affirm the trial court's decision to award damages based upon an annual salary of $75,000.

## Commissions

Finally, Dunn argues that the trial court erred by refusing to award damages for commissions. Dunn's employment contract provided for "commissions of 3% on sales of all retail banking or similar production related projects." The trial court declined to award damages for these commissions because they were too speculative. We find no error with this decision.

Dunn asserted that he had plans for eighty to one-hundred more displays with Financial Supermarkets that he would have seen through to fruition had his contract with Matrix not been breached. The trial court found Dunn's evidence insufficient principally because there was proof of only one contract with Financial Supermarkets for about $50,000. There was simply no proof to support Dunn's claim for future commissions because, as the trial court found, there was no evidence of a contract with Financial Supermarkets, nor a letter of intent for more stores. Thus, Dunn's assertions that such contracts would have come into existence were merely speculative.

## In Conclusion

We affirm the finding that Matrix was in material breach of the employment contract and affirm the award of $85,559.16 as compensatory damages for Dunn's salary, his car allotment and moving expenses. We reverse the denial of compensation for deferred compensation units, finding that Dunn is entitled to an additional award of $282,500 as compensatory damages for the deferred compensation units. We affirm the trial court in all other respects. This matter is remanded to the trial court for the entry of a judgment consistent with this opinion. Costs of appeal are assessed against Appellee Matrix Exhibits, Inc.

_____
FRANK G. CLEMENT, JR., JUDGE