KENTUCKY HOME MUT. LIFE INS. CO. *v.* ROGERS.

(*Nashville*, December Term, 1953.)

Opinion filed May 21, 1954.

642

Bullitt, Dawson & Tarrant, of Louisville, Ky., Bass, Berry & Sims, of Nashville, for plaintiff in error.

Joseph L. Lackey and George C. Anderson, both of Nashville, for defendant in error.

Mr. Justice Burnett delivered the opinion of the Court.

This was a suit at law in an action for damages for the alleged breach of an insurance contract. The case was heard below by the trial judge sitting without the intervention of a jury. The trial judge rendered judgment in favor of Rogers and against the Insurance Company, hereinafter called the Company. On appeal the

Court of Appeals affirmed but for a different reason. Due to the conflict in certain features of the case by these two courts and by the Federal courts, hereinafter referred to, we granted certiorari. Argument has been had, excellent briefs filed, and after a considerable independent investigation, in addition to reading and re-reading the briefs filed in the case, we have reached a determination of the question.

■ Preliminary to discussing the facts and law applicable thereto in the instant case we might say that where an insurer wrongfully cancels, repudiates, or terminates a contract of insurance, the insured may at once pursue either of three courses. (1) He may elect to consider the policy at an end and recover the just value of the policy, or such measure of damages as the court in its particular jurisdiction approves, (2) he may institute proceedings in equity to have the policy adjudged to be in force, or (3) he may tender the premiums and if acceptance is refused, wait until the policy by its terms becomes payable and test the forfeiture in a proper action on the policy. Cyclopedia of Insurance Law, Crouch, Vol. 6, Sec. 1429. Many cases outlining these questions and the various procedures as suggested by what we have just said may be found in Annotations 48 A. L. R. page 107, and in 107 A. L. R. page 1233.

■ Rogers in the instant case elected to pursue his rights under (1) above. As to the measure of damages when the contract is breached this Court in *Life & Casualty Ins. Co.* v. *Baber,* 168 Tenn. 347, 79 S. W. (2d) 36, 107 A. L. R. 1228, held that the measure of recovery to the insured where the insurer has breached the contract is the amount of premiums paid, or premiums with interest where there has been a wrongful repudiation of

the contract by the insurer. This is the majority rule. We have read a great many cases of comparatively recent years where this rule is applied to situations wherein the insurer has breached its contract with the insured. We see no reason to change this rule. Of course the selection chosen by Rogers as to the course he would pursue is by far the most hazardous selection. This, though, plays no part in nor has anything to do with the decision of this lawsuit.

The policy alleged to have been breached in this case was originally issued by the Inter-Southern Life Insurance Company in 1927, by which the insurance company insured the lives of 171 members of the Nashville Postal Employees Benefit Society, an unincorporated association. By subsequent mutual agreement, the anniversary date of the policy was changed so that each policy year began on February 19th. The policy was issued for a term of one year, renewable from year to year for a further term of one year upon the payment of the premium for the amount of insurance as renewed. This policy set out the amount of insurance available to members according to age, and contained a schedule of premium rates per thousand dollars at all ages from 15 to 100 years, inclusive, effective at the beginning of the policy year for which the premium was payable. The policy among other provisions contained this:

"At the end of each year from date hereof the Company shall have the right to change the premium rates at which subsequent renewals shall be computed, such changes being based on the Company's classified group mortality experience and schedules then in force."

Contemporaneously with the mutual agreement chang-

ing the anniversary date of the policy there was endorsed upon it the following provision:

"Unless or until otherwise provided by the Nashville Postal Employees Benefit Society, each member insured hereunder shall pay the same rate per $1,000 of insurance. This individual premium rate per $1,000 of insurance will be determined at the beginning of each policy year by dividing the total premium calculated as provided in the policy contract by the total insurance benefit, and this rate shall be applicable to each member insured hereunder regardless of age.

"Any employee insured hereunder whose membership in the Nashville Postal Employees Benefit Society is kept in good standing, may have his insurance granted hereunder continued, so long as this group policy is continued in force and the premiums due for such insurance are duly paid by the employer to the company."

Following the provisions last above quoted all members of the Society paid each year the same premium rate for $1,000 in insurance, irrespective of age, up to February 19, 1933. In 1932 there were receivership proceedings against the Inter-Southern Life Insurance Company and on August 8, 1932, there was an order authorizing and approving the re-insurance of the business of this company including the policy herein involved by the Kentucky Home Mutual Life Insurance Company, the plaintiff in error. We are of the opinion that thus the Kentucky Home Mutual Life Insurance Company, the plaintiff in error, stepped into the shoes of the Inter-Southern Life Insurance Company and received what benefits the Inter-Southern Company was entitled to

under the policy as well as assumed the same burdens that the Inter-Southern Company was bound by under the terms of the policy herein.

Obviously under the provision above quoted which was endorsed on the policy where each member paid the same rate per $1,000 of insurance, irrespective of age, resulted in younger members of the group paying more and the older members paying less than they would have had to pay had each paid the scheduled rate applicable to his attained age. Thus for the purpose of in some way eliminating this unfairness to the younger members of the Society, the company, prior to the beginning of the policy year in February, 1933, submitted to the Society for its approval what was known as a step rate schedule of premiums, under which each member paid an annual rate per $1,000 according to the group of years in which his age fell. That is those insured in the Society up to 49 years of age paid $10 per $1,000; those from 50 to 54, both inclusive paid $15 per $1,000; those from 55 to 59, both inclusive paid $22 per $1,000; and those 60 years or over paid $36 per $1,000. This was what is known as the step rate plan which obviously gave the older members in the group some advantage over the younger ones in that group. This proposal by the Company to change to the step rate plan was approved by the Society, and the Company was so advised by letter. The Company caused to be mailed to each insured member a letter dated January 26, 1933, advising each member of the change in rates and of the exact schedule of rates applicable to the individual member under that change. The new rates were made effective for the policy year beginning February 19, 1933, and were continued in effect for each policy year thereafter to and including the

policy year beginning February 19, 1945, and each insured member during that period of time paid the rate applicable to him under the step rate schedule.

A little over a year prior to the beginning of the policy year of February 19, 1946, the Company decided that instead of continuing to collect from each of the insured members premiums calculated according to the step rate schedule, it would collect premiums based upon the attained age rate schedule for each insured employee as set out in the policy. It notified the Secretary of the Society of this decision by letter dated January 19, 1945, and this new schedule of rates was put into effect as of February 19, 1946, and was in effect from that time until the final decision in a case decided by the Federal Court involving the same questions herein which will hereinafter be noted. Beginning with February 19, 1946, all insured members were required to pay the new schedule rates on the attained age rate basis, as set out in the policy. This resulted in causing all the older members to pay much higher rates and the younger members to pay lower rates than they would have paid under the step rate schedule. Rogers' premium under the step rate schedule was $36 per $1,000, but under the attained age rate his premium was jumped in this one year from $36 per $1,000 to $89.57 per $1,000 with an added increase for each succeeding year that he lived.

At the time of this change by the Company from the step rate plan to the attained age rate Rogers was 74 years old and according to the schedule under the attained age rate his premiums would materially increase each year. This being true Rogers did not pay the premium demanded by the Company in 1946 and since he did not pay this premium after the grace period the Com-

pany lapsed the policy. As far as the record shows Rogers did nothing about the matter, did not communicate with the Company or otherwise, until the present action was filed. A part of the delay in filing the action is unquestionably due to another suit against the Company. This suit, the final opinion is reported in 6 Cir., 190 F. (2d) 797, styled, *Kentucky Home Mutual Life Ins. Co.* v. *Duling*. That suit was instituted in the Davidson County State Courts and removed by the Insurance Company to the Federal Court. It was instituted January 16, 1948 by Duling who was the President of the Nashville Postal Employees Benefit Society. In this suit Duling attempted to file the action as a class action so as to bring in all the members of the Nashville Postal Employees Benefit Society who were insureds of this Company. Many of the identical questions are raised in this suit as are raised herein. The Circuit Court of Appeals opinion held that the suit could not be maintained as a class action but did allow it to be maintained in Duling's name. That Court held that there was a breach of contract by the Company in favor of Duling and that his right of action was limited to a breach of contract with damages in the amount of extra premiums paid by Duling with interest from date. This recovery was based on our case of *Still* v. *Equitable Life Assurance Society of the United States*, 165 Tenn. 224, 54 S. W. (2d) 947, 86 A.L.R. 382. In this case Duling had paid the increased premium as demanded by the Company. The Federal Court held that the Company had no right to change from the step rate plan to the attained age plan and limited the premiums that they were allowed to collect to the step rate plan and awarded Duling a recovery of such premiums that he had paid over this amount. There is filed in the

instant case a list of those who were in Duling's situation, that is, those who had paid the attained age premium and the overage that they had paid above the step rate plan. All of these overage premiums, i. e., the amount collected above the step rate, were paid back to these seventy-odd individuals by the Company at the conclusion of this Duling case. The Duling suit was decided by the Circuit Court of Appeals on July 16, 1951. After this decision the Company wrote the attorney in the present litigation for Rogers offering to reinstate Rogers' insurance contract at that time on the step rate basis as was determined in the Duling case. Rogers refused to accept this offer which was tendered to him and chose to rely upon his rights as presently before this Court.

The Duling suit sought to recover damages in the extent of all premiums paid by each member with interest and by a second count sought, if they were not entitled to that, to recover the excess premiums paid by those who had continued their insurance in force. It was on this second count that the damages to Duling were awarded.

It seems to us that the present suit narrows itself to the simple proposition of Rogers saying to the Company, you have breached your contract and I am entitled to damages by reason of your breach. On the other hand the Company says, we have not breached our contract and we had a right to do what we did. Of course if it turns out that the contract was not breached and the Company did have a right to do what they did then Rogers can get no damages but on the other hand if the Company did breach its contract then Rogers is entitled to damages. He of course in not paying premiums and doing one of two or three things that he might have done was gambling on the fact that the Company would be held

to be breaching their contract. Under such circumstances as allowed the Company to make the change Rogers could not have recovered while if the Company did not have this right the contract was breached by them and he did have a right to recover.

In 1945 when the Company wrote the Secretary of the Society that the rates were to be changed from the step rate to the attained age plan they told the Secretary that this change was based on the Company's classified group mortality experience and schedules then in force and that since they had not been able to have access to the younger employees of the Post Office they could not service them and get them in the Society, consequently their risks were all getting to be older men. This letter to the Secretary was never acquiesced in by the Society and his answer to the letter was merely to the effect that the Company had "struck a snag" in attempting this raise. Of course the only conclusion of that is that the members were not agreeing to it. The evidence in the record shows that the change in rates by the Company was justified under their classified group mortality experience and was really required by sound actuarial principles. For these reasons the Company contends here, as it did in the Duling case, supra, that the change was authorized by the specific policy provision reading:

"At the end of each year from date hereof the Company shall have the right to change the premium rates at which subsequent renewals shall be computed, such changes being based on the Company's classified group mortality experience and schedules then in force."

Obviously this policy provision, just quoted, relates solely to the right of the Company "to change the

premium rates at which subsequent renewals shall be computed." The Company at the time the policy was written had agreed upon a plan by which the payments could be made by the members of this Society wherein a total premium for all of the insureds was divided and paid equally by them and this plan was later by consent of the Society changed to a step rate plan. It was plainly agreed by the Company that this step rate plan of premium payments would be in force, "unless or until otherwise provided by the Nashville Postal Employees Benefit Society" (full paragraph of the policy is quoted in the outset of this opinion from which this quotation is taken). In other words what this means, so it seems to us is not subject to debate, is that by a mere reading of this language aside from the previous acts of the Company when they changed from the first plan adopted to the step rate plan wherein the Company got the consent of the Society before they did this, that it must be known to the company that the insureds must consent to any change from the step rate plan to the attained age plan. Of course the Company had the right at the end of each year to change the rates but not the plan. This was the conclusion of the lower courts and also the Federal Court in the Duling case. This endorsement, copied in the outset of our opinion, of course bound the Company as well as the members of the Society. Under it older members acquired a contractual right to carry insurance at a lower premium than would have been required under the attained age schedule set out in the policy. The change made in 1933 to the step rate plan was made by mutual agreement as we have said and under it the Company accepted those rates from the members of the Society. The Company clearly had no right to revert to the attained age method without the consent of the Society.

"Such a change involved much more than a change in renewal rates. It materially affected the relative rights between the insured members, acquired by the existing contract provision provided for the step-rate method of payment." *Kentucky Home Mutual Life Ins. Co.* v. *Duling,* supra, 190 F. (2d) 804.

We are convinced that the Company in good faith believed that it was operating under its insurance contract and exercising a right thereunder given to it by the contract to change its premium rates, but conceding that the Insurance Company so acted a cardinal principle of insurance law must be kept in mind. This principle is that a policy or contract of insurance is to be considered liberally in favor of the insured, and strictly as against the company. As stated more fully, the rule is, that where by reason of ambiguity in the language employed in a contract of insurance, if there is doubt or uncertainty as to its meaning, and it is fairly susceptible of two interpretations, one favorable to the insured and the other favorable to the company, the former will be adopted. This cardinal principle needs no citation of authority for it is certainly the law in this State and in all other jurisdictions insofar as we know. And yet with this cardinal principle before it the Insurance Company notified the Society that these rates would be upped, that is, from the step rate to the attained age plan which was about two and one-half times increase over the rate in force. Clearly the language at the very least should have created in the mind of the Insurance Company a doubt as to their rights thereunder and knowing then that there was an ambiguity in it that the language would be construed in favor of the insureds. The Company should not be allowed to put forward their good faith change as

an excuse or a bar to allowing damages when they have breached the contract thereunder.

■ The trial court in the instant case held that the Insurance Company in attempting this change acted in good faith and on appeal the Court of Appeals held that the Company in attempting to make this change did not act in good faith. The United States District Court in the Duling case held that the Company committed a "constructive fraud" in making the change while the Circuit Court of Appeals reversed the District Judge on the question of a constructive fraud and held that the acts were in good faith. The books recognize "constructive fraud". 23 Am. Jur., page 756, Sec. 4; 37 C. J. S., Fraud, Sec. 2, p. 211. It is said there that a constructive fraud is a breach of legal or equitable duty and that in committing such a fraud one is not guilty of a moral guilt but that he may be guilty of such a fraud without any actual dishonesty of purpose or intent to deceive. Numerous cases are cited in these two texts on the question. Of course the Court of Appeals in holding that the Company was not acting in good faith in effect said, the Company lacked good or moral intent in its motive for increasing these premiums. In other words the lack of good faith as they use the term was more or less describing the state of mind of the Company which underlay and caused their acts of refusal to pay. As before said, we think that the Company was faced with the necessity of raising its rates which resulted from various things primarily the fact that the Company was not able to service the employees of the Post Office and get a younger group into this membership so as to offset the gradual increase in the average age each year. Of course it is not known that the Company could have gotten these

younger members in and to share part of the burden of the older members but nevertheless that is their argument and one we think under this record made in perfectly good faith.

Of course the Company did have the right to put increased rates into effect but they did not have the right to do it in the manner which they adopted. These new rates which they did attempt to put into effect were not just figures drawn out of thin air, but they were the identical rates set out in the policy as issued before the provisos quoted at the outset of this policy were adopted and made a part of the policy. As far as this record is concerned the policy did not become effective on any member at its inception until that proviso was affixed thereto. Clearly the Company should have known this and when they attempted to go through some other plan than that authorized in the provision of the contract the Company at the very least should have known that this question was ambiguous and that if it was ambiguous that it would be held against them and yet they went ahead and put in these rates which had never been agreed to (even though they were typed in as a part of the policy but never agreed to), the provision added merely made these rates figured on the group as a whole and not applicable to any one individual.

██ The Company very forcibly argues that since this change in rates was due to a misunderstanding on their part as to their legal right, and that they were acting in good faith in making this change, that then this cause of action should not be allowed to stand. The Company relies very strongly on *Moberly* v. *New York Life Ins. Co.*, 295 U. S. 632, 55 S. Ct. 876, 878, 79 L. Ed. 1621, and *New York Life Ins. Co.* v. *Viglas*, 297 U. S.

672, 56 S. Ct. 615, 80 L. Ed. 971, and particularly upon the following language from the Moberly case:

"Repudiation by one party, to be sufficient in any case to entitle the other to treat the contract as absolutely and finally broken and to recover damages as upon total breach, must at least amount to an unqualified refusal, or declaration of inability, substantially to perform according to the terms of his obligation. * * * Mere refusal, upon mistake or misunderstanding as to matters of fact or upon an erroneous construction of the disability clause, to pay a monthly benefit when due is sufficient to constitute a breach of that provision, but it does not amount to a renunciation or repudiation of the policy."

And in the Viglas case, supra [297 U. S. 672, 56 S. Ct. 615], the Supreme Court of the United States again enunciated the principle above quoted and held that:

"Viewing the case before us independently, we hold that upon the facts declared in the complaint the insurer did not repudiate the obligation of the contract, but did commit a breach for which it is answerable in damages."

Thus it will be seen and it is evident upon a reading and study of those two cases that even though the repudiation is not made in bad faith still if there is a breach of contract it sounds in damages. The principles of law as stated in those two cases are excellent and if the facts here fit the facts there we would be inclined to follow the cases and yet we are in a way following them because that court has held that still the breach of the contract would sound in damages. What those cases were really holding was that there was not such a repu-

diation of policy as would warrant the recovery of the present worth of the future installments during insureds' life expectancy on the theory of anticipatory breach merely because the Company in good faith refused to make monthly payments under a disability clause of a life policy.

So in the last analysis it seems to us that it gets down to the question of what is the measure of damages due Rogers by the Company's breach of contract under the circumstances hereinbefore outlined. During the last several days the writer of this opinion has spent a great deal of time making an independent search of the authorities over the United States on the question. After such an investigation it seems to us that the question has been very ably presented in the opinion in the Baber case, supra. In that case Judge McKinney argued the question backward and forward, citing numerous authorities that we have in the last few days read. As we see the policy in this case there is nothing left in the policy after it has been lapsed. At Rogers age he could not get any more insurance and if he did the cost would be prohibitive. Then too we have found a number of decisions, of recent vintage, that allow recovery for premiums paid plus interest thereon for a breach of the policy. Such a case is *McLaughlin* v. *Brotherhood of Railroad Trainmen*, 216 S. C. 233, 57 S. E. (2d) 411. There are many others but needless to say it is not necessary to cite these various cases herein because we feel that due to the breach and due to the fact that this Court has already established the measure of damages when there is a breach that the amount fixed by the two courts herein is the correct amount—this amount was based on the rules laid down in the Baber case, supra. In the Baber case,

supra, this Court speaking through Mr. Justice McKinney pointed out that conditions may exist under which the policy holder would be entitled to the value of his policy and this Court specifically recognized therein that old age and physical disabilities might enter into the rights of the policy holder. Immediately following the Baber case this Court rendered an opinion in *Davis* v. *Amra Grotto M. O. V. P. E. R.,* 169 Tenn. 564, 89 S. W. (2d) 754, 106 A. L. R. 1506, wherein this Court held that on insolvency of an insurance company that a creditor might recover for the value of his policy as of the date of insolvency just as if there had been a breach of the contract by the insurance company as of that date. The Court there distinguished the case from the Baber case making similar comments to those made by us last above. In the instant case it seems to us that the measure of damages as fixed by the other two courts in this case is the correct measure because as we read the policy we cannot find that it has any value.

It results that the judgment of the Court of Appeals and the trial court is affirmed for the reasons herein expressed.