51 F.3d 271
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
CROWN AMERICAN CORPORATION, Plaintiff-Appellee,
v.
OLIVER SMITH REALTY & AUCTION COMPANY, INC., Defendant-Appellant.
 No. 94-5026.
 United States Court of Appeals, Sixth Circuit.
 March 29, 1995.
 
 Before: MERRITT, Chief Judge; and KEITH and BOGGS, Circuit Judges.
 PER CURIAM.
 
 
 1
 Oliver Smith Realty & Auction Company, Inc. appeals from a grant of summary judgment in favor of Crown American Corporation. Smith Realty sued Crown in federal district court over an allegedly unpaid commission. Crown countered by filing an action in the Chancery Court for Knox County, Tennessee, seeking a declaratory judgment. Crown's action was removed to the district court and consolidated with Smith's. The parties filed cross-motions for summary judgment.
 
 
 2
 The district court granted Crown's motion for summary judgment. For the reasons set out below, we affirm.
 
 
 3
 * Crown American is a developer and operator of shopping malls, based in Johnstown, Pennsylvania. Smith Realty is a real estate and auction company located in Knoxville, Tennessee, specializing in the sale of commercial properties. In 1987, Crown purchased approximately 95 acres of land from the City of Oak Ridge, Tennessee. It paid $3.2 million for the land and made approximately $4 million in improvements. Crown intended to develop the property and build a new shopping mall.
 
 
 4
 Subsequently, Crown purchased and expanded an existing mall in Oak Ridge, and abandoned its idea of building a new mall on the 95 acres. After attempts to sell the property on its own failed, Crown turned to Smith for help. Crown wished to intensify the sales effort to obtain cash for its business. Because Crown's investment stood at almost $75,000 per acre, Crown hoped the property could be sold for at least $55,000 per acre.
 
 
 5
 On February 14, 1992, the parties executed a letter of understanding, part of which was an auction agreement. The letter of understanding contemplated a 3-step process: 1) a pre-auction marketing phase; 2) a reserve auction; 3) a post-auction brokerage phase.
 
 
 6
 a. The pre-auction phase: This phase was to last sixty days, giving Crown time to fashion a plan to subdivide the property into smaller tracts, coordinate zoning and other municipal approvals, and work out the terms of sale. Simultaneously, Smith would begin marketing the property.
 
 
 7
 b. The reserve auction: This phase was tentatively scheduled for April 25, 1992. It was to be a one-day "reserve" auction, meaning Crown would reserve the right to reject any bids.
 
 
 8
 c. The brokerage phase: This phase was to follow the auction. Apparently, both parties believed all the property would not be sold at the auction, so a four-month period of active brokerage under an exclusive listing was to follow. Sales commissions were to be 6% for property sold back to the city of Oak Ridge, and 8% for any tract sold to others.
 
 
 9
 In mid-March of 1992, Smith told Crown a review of comparable sales in Oak Ridge indicated that offers at the auction could be as low as $20,000-35,000 per acre. Crown's Chairman, Frank Pasquerilla, apparently feared that the auction could turn into a disaster and that Crown would be forced to refuse every bid. On March 23, 1992, five weeks into the pre-auction phase, Mr. Antonazzo (Vice-President of Crown) called Smith Realty. Smith Realty claims that Antonazzo withdrew the 95 acres from the auction. Crown claims that Antonazzo merely suggested to Smith that they skip the auction and move directly to the brokerage phase of the Sales Agreement.
 
 
 10
 Smith wrote Crown a letter in response to the March 23 phone call. In this letter, dated March 24, Smith stated that Crown "notified Oliver Smith, IV by telephone Monday morning, at approximately 9:30 a.m. that Frank Pasquerilla had made the decision to withdraw[ ] the entire 95 acres in Oak Ridge from the Auction." However, Smith stated that it was still interested in working with Crown to sell the property, and was considering Crown's proposal.
 
 
 11
 A March 31 letter from Smith to Crown stated that Smith was still considering a proposed listing arrangement, but would not make a decision without confirming Crown's minimum acceptable price. Crown stated that it wanted $55,000 per acre. Smith believed this price was unrealistic and rejected Crown's proposal.
 
 
 12
 On April 6, 1992, Smith informed Crown by letter that its "withdrawal" of the property from the auction entitled it to a $418,000 commission. Until this point, neither side characterized Crown's statements as an anticipatory repudiation or as invoking any punitive aspect of the agreement. Smith's contention was based on Paragraph 13 of the auction agreement.
 
 
 13
 13. Miscellaneous. Owner agrees that no part of said real property described in this agreement shall be sold until the date of the auction sale herein provided for, without the written consent of the Auctioneer. In the event any of Owner's property is so sold prior to the auction sale by the Owner, the Owner shall pay to the Auctioneer the commission rate set forth in this contract.
 
 
 14
 In the event that the Owner withdraws prior to the date of auction any real property from the auction, the Auctioneer is due his full commission rate as set out in this Agreement, based on the fair market value of the property withdrawn.
 
 
 15
 Antonazzo, in a letter to Smith dated April 9, stated that Smith obviously misunderstood Crown's statements. Crown feared the auction would be futile and thought going to direct sales more profitable. However, Crown stated unequivocally that while it thought it was "preferable" not to continue with the auction, it was willing to proceed. Smith, however, characterizes Crown's letter as an "attempt[ ] to recant its withdrawal" after realizing "the commission was due under the terms of the contract."
 
 
 16
 Despite further correspondence from Crown, Smith refused to hold the auction. Smith now argues that it refused to hold the auction because it had "lost confidence in Crown's intentions to participate as a good faith and willing seller."
 
 II
 
 17
 This court reviews de novo the district court's grant of Crown's motion for summary judgment. Baggs v. Eagle-Picher Indus., Inc., 957 F.2d 268, 271 (6th Cir.), cert. denied, 113 S.Ct. 466 (1992). This court must affirm the district court only if it determines that the pleadings, affidavits, and other submissions show "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When evaluating this appeal, this court must view the evidence in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).
 
 
 18
 The moving party need not support its motion with evidence disproving the nonmoving party's claim, but must only " 'show[ ]'--that is, point[ ] out to the district court--that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). "The 'mere possibility' of a factual dispute is not enough." Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir.1992) (quoting Gregg v. Allen-Bradley Co., 801 F.2d 859, 863 (6th Cir.1986)).
 
 III
 
 19
 Both parties argue strenuously that Crown's action was not an anticipatory repudiation--Crown in hopes of avoiding liability, Smith in hopes of recovering under an alternate theory. Because both parties now argue that there was no anticipatory repudiation, we address this issue only briefly. We conclude, as did the district court, that Crown's conduct did not amount to an anticipatory repudiation of the contract.
 
 
 20
 Both parties agree that Tennessee law governs in this diversity case. In Tennessee, a party repudiates its obligations under a contract only where there is a "total and unqualified refusal to perform the contract." Wright v. Wright, 832 S.W.2d 542, 545 (Tenn.App.1991) (emphasis added). See also UMIC Gov't Sec., Inc. v. Pioneer Mortgage Co., 707 F.2d 251, 253 (6th Cir.1991); GRW Enter., Inc. v. Davis, 797 S.W.2d 606, 613 (Tenn.App.1990); Kentucky Home Mut. Life Ins. Co. v. Rogers, 270 S.W.2d 188, 195 (Tenn.1954). Therefore, an "expression of intention not to perform, or an attitude indicating a desire for further negotiations will not amount to a repudiation." Caudill Properties, Inc. v. Cox, Slip Op. at 2-3 (Tenn.App. Nov. 1, 1984) (LEXIS, States library, Tenn file). Tennessee secondary authority supports this position. "Repudiation of contract by one party must amount to an unqualified refusal or declaration of inability to substantially perform his obligations thereunder in order to entitle the other party to recover...." 7 Tenn.Juris., Contracts, Sec. 79.
 
 
 21
 There is, as Smith appears to concede by arguing for an alternate theory of recovery, no evidence that the contract was totally and unequivocally breached. Crown was willing to proceed with the rest of the contract, and Smith never informed Crown that it considered its conduct to be a breach. In fact, Smith admits that it took Crown's proposals under consideration. Finally, when Smith informed Crown that it considered the property to be "withdrawn," Crown told Smith that it was ready and willing to go through with the auction if Smith insisted.
 
 
 22
 These facts, combined with Smith's own refusal to characterize the conduct of Crown as an anticipatory breach, make it clear that there simply is no question of fact about Crown's purported repudiation. The actions of Crown did not constitute a complete and unequivocal repudiation of the entire sales agreement, and therefore were not an anticipatory repudiation.
 
 IV
 
 23
 Apparently realizing the problems posed by an anticipatory breach theory, Smith eschews this doctrine. Instead Smith argues that paragraph 13 functions as an "election" clause, similar to the "take or pay" clauses found in the oil and natural gas industry. Such a clause requires the purchaser to take a fixed amount of resources for a given period, or to pay for what it does not take. The purpose of a "take or pay" clause is, among other things, to flatten out price shocks and insure adequate cash flow.
 
 
 24
 Smith argues that paragraph 13 is just such a clause. Crown could "auction or pay." Admittedly this argument may be persuasive in different circumstances, particularly where an auction is without reserve, forcing the seller to accept the highest bid. In such a circumstance, a seller might withdraw the real estate in an effort to avoid the sale, thereby preventing the earning of a commission. Such a clause then would function similar to a liquidated damages clause.
 
 
 25
 However, these are not the circumstances presented by this case. As we noted previously, the parties agreed to a reserve auction. Such an auction would give Crown the unfettered right to reject any bid at the time of auction. It would be incongruous to conclude that Crown could reject every bid at the auction, thereby precluding any commission, yet be forced to pay a full commission if it "withdrew" the property before auction.
 
 
 26
 Furthermore, there is simply no evidence that the property was completely and unequivocally withdrawn from the sale, or from the auction for that matter. For the same reasons that there is insufficient evidence to create a question of fact as to whether Crown repudiated the contract, there is likewise insufficient evidence to create a question of fact as to whether the land was totally and unequivocally withdrawn from the auction. Particularly where, as here, Crown was willing to proceed with the auction, and by the terms of the letter of understanding the April 25th date was "tentative," there is no question but that any discussions on revising the contract terms did not amount to a total and unequivocal withdrawal.
 
 V
 
 27
 For the foregoing reasons, the judgment of the district court is AFFIRMED.