# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### April 3, 2007 Session

# UT MEDICAL GROUP, INC. v. VAL Y. VOGT, M.D.

**Appeal by permission from the Court of Appeals, Western Section
Chancery Court for Shelby County
No. CH-04-0303-2     Arnold Goldin, Chancellor**

---

**No. W2005-00256-SC-R11-CV - Filed on August 20, 2007**

---

We granted review in this case to determine whether UT Medical Group, Inc. presented a justiciable case or controversy to the trial court when it alleged that Dr. Vogt anticipatorily breached an employment contract covenant. Because the record fails to show that Dr. Vogt committed an anticipatory repudiation of the non-competition covenant found in her employment agreement, Dr. Vogt is entitled to summary judgment. Therefore, we reverse the judgment of the Court of Appeals and remand this case to the trial court for the entry of an order dismissing the case.

**Tenn. R. App. P. 11; Judgment of the Court of Appeals Reversed and
Case Remanded to the Chancery Court for Shelby County**

CORNELIA A. CLARK, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and GARY R. WADE, J. and DAVID G. HAYES, SP. J. joined. JANICE J. HOLDER, J., not participating.

Kenneth P. Jones, Memphis, Tennessee, for the appellant, Val Y. Vogt, M.D.

Stephen H. Biller and Walter E. Schuler, Memphis, Tennessee, for the appellee, UT Medical Group, Inc.

## OPINION

### Factual & Procedural  Background

The procedural history of this matter is complicated, but its recitation is necessary to understand our resolution of the case.

In 1997, UT Medical Group, Inc. ("UTMG"), an independent, not-for-profit organization in which faculty members of the University of Tennessee Medical School practice medicine privately, and Dr. Val Y. Vogt, M.D. ("Dr. Vogt"), a faculty member and urogynecologist, agreed to and signed a Physician Employment Agreement.

Subsequently, on March 12, 2002, a second Physician Employment Agreement ("Agreement") was agreed to and signed by the parties.[1] As part of this Agreement, Section 22 sets forth a non-competition covenant.[2] In pertinent part, it provides:

> (a) . . .Physician agrees that in the event his or her employment with UTMG is terminated for any reason, voluntarily or involuntarily, with or without cause, or in the event Physician voluntarily leaves the employment of UTMG, Physician will not for a period of one (1) calendar year engage in the practice of medicine, either directly or indirectly, actively or passively, under contract or otherwise, as an employee, owner, partner, agent, stockholder, director, or otherwise in the Restricted Area. . . . Physician consents in such event to the granting of injunctive relief against any continuing breach, together with retrospective relief in the form of liquidated damages equal to [66 2/3%] of all fees or other income generated or obtained by Physician or through his or her efforts as a result of the breach. In the event UTMG is granted injunctive relief as provided herein, whatever portion of the one (1) year term stated in subsection (a) of this Section 22 had not expired at the time the breach first occurred shall be tolled by the breach, and shall begin to run again as of the date permanent injunctive relief is granted. Physician shall be liable to UTMG for all costs reasonably incurred by UTMG in pursuing enforcement of the provisions of this Section, including but not limited to reasonable attorneys fees and costs.
>
> (b) As an alternative to the remedies otherwise afforded by this Section 22, Physician may elect to buy out his or her obligations under this Section 22 . . . by completing each of the following steps: (i) providing proper written notice to

---

[1] There is disagreement between the parties as to the effective date of the Agreement. For the purposes of our analysis, however, this dispute is of no consequence.

[2] Although this Court held in Murfreesboro Med. Clinic, P.A. v. Udom, 166 S.W.3d 674 (Tenn. 2005), that, except for those specifically prescribed by statute, physician covenants not to compete are unenforceable and void as against public policy, the non-competition agreement at issue in this case is specifically authorized under Tenn. Code Ann. § 63-6-204(e) (2004).

Additionally, 2007 Public Chapter No. 487, which will take effect January 1, 2008, amends Tennessee Code Annotated, Title 63, to provide specifically that healthcare provider non-competition agreements will be deemed valid and reasonable if the duration of the restriction is two years or less and there is either: (1) a geographic restriction that does not exceed the greater of a) 10 miles from the provider's primary practice site or b) the county in which the provider's primary practice is located; or (2) if there is no geographic restriction, the provider is restricted from practicing his or her profession at any facility at which the employee entity provided services.

UTMG of Physician's termination of this Agreement; (ii) including in such written notice a statement that Physician is exercising his or her election under this Section 22, subsection (b); and (iii) paying UTMG a dollar amount [equal to] . . . 100% of Physician's Annual Planned Income for the fiscal year preceding the termination of employment with UTMG.

On the Agreement's signature page, the parties defined "Restricted Area" "[t]o include Shelby County, Tennessee and a 150 mile radius of Shelby County, Tennessee." In order to terminate the Agreement voluntarily, the Agreement's Section 20 provides that Dr. Vogt must give UTMG written notice of her intent to terminate the Agreement voluntarily "at least sixty (60) days prior to the effective date of termination."

On December 15, 2003, Dr. Vogt wrote a letter to UTMG's chief medical officer, Dr. Jeffrey R. Woodside, indicating that she planned to resign her UTMG position on March 12, 2004. Four days later, Dr. Woodside replied to Dr. Vogt's letter, via e-mail, asking her whether she planned to engage the process outlined in the Agreement's Section 22(b) to buy out her non-competition covenant. In his letter, Dr. Woodside stated the three options available to Dr. Vogt:

[T]otal freedom to practice medicine at any time outside the Restricted Area described in your employment agreement, *or* not practice medicine within the Restricted Area for one calendar year following your departure from UTMG, *or* buy-out your obligation for [$194,197, the agreed upon buy-out price,] and practice medicine at any time within the Restricted Area.

(emphasis added).

Before Dr. Vogt responded to Dr. Woodside's e-mail, on January 7, Dr. Owen P. Phillips, interim chair of the University's Department of OB/GYN, sent Dr. Vogt an e-mail asking her to reconsider and "put [her] resignation on hold for a year. . . . If you elect to stay for the next year (through June 2005), I will press UTMG to adjust the non-compete clause amount. I know this has been done in other departments." Unpersuaded by UTMG's attempts to retain her services, on January 14, 2004, Dr. Vogt replied to Dr. Woodside's e-mail, stating "[t]his is a followup to my previous letter of resignation. . . . After much consideration I plan to engage in the practice of medicine locally. . . . I wish to discuss the buy-out and the possible mechanisms that address the non-competition component of my contract."

During the weeks after Dr. Vogt's e-mail to Dr. Woodside, the parties engaged in a period of intense maneuvering and negotiation. Dr. Vogt met with Dr. Woodside to discuss a possible reduction of the Section 22(b) buy-out option. After an exchange of several more e-mails between Dr. Vogt and Dr. Woodside, UTMG refused to reduce the buy-out amount. Instead, on February 2, 2004, UTMG's counsel sent a letter to Dr. Vogt, which stated:

I understand [that] conversations between you and Dr. Woodside relating to the potential exercise of your buyout option concluded this morning without agreement. . . . We take your declaration of intent to practice "locally" to be a declaration of intent to breach your non-competition covenant. The effect of your declaration of such intent is to require us to take prompt action to secure your promise not to violate your non-competition covenant and, if we cannot do so, to initiate legal action to enjoin your anticipatory breach.

In response to this letter, on February 10, Dr. Vogt's attorney wrote a letter to UTMG's attorney re-confirming Dr. Vogt's intention to practice medicine locally after her resignation from UTMG *and* declaring her desire "to exercise the buy-out option" as provided for in the Agreement. On the same day, UTMG's attorney responded to the letter, demanding the payment of $194,197 (or the execution of a promissory note in that amount payable on or before March 5, 2004) and threatening Dr. Vogt with having to pay attorney's fees, interest, and costs associated with pursuing a lawsuit if she did not accept this proposal by 5:00 p.m. that same day. The letter also promised to "involve" the doctors that UTMG believed Dr. Vogt intended to practice with after her resignation "due to their knowingly interfering with the contractual relationship" between UTMG and Dr. Vogt. Dr. Vogt responded to this letter by again expressing her desire to exercise the buy-out option.

On February 13, UTMG filed a complaint against Dr. Vogt in Shelby County Chancery Court, claiming that Dr. Vogt had committed an anticipatory breach of the Agreement. The complaint alleged, inter alia, that, through her resignation letter and subsequent e-mail to Dr. Woodside, Dr. Vogt had "admitted her intent to breach and has breached the Employment Agreement . . . ." Additionally, UTMG alleged that it had "come to understand that [Dr. Vogt] had leased space . . . with the intent of establishing an office for the professional practice of medicine in the specialty of urogynecology." To remedy Dr. Vogt's alleged anticipatory breach of contract, UTMG sought a declaratory judgment that the Agreement's Section 22 was valid and enforceable and an injunction prohibiting Dr. Vogt from violating the Agreement. Significantly, in light of the letter sent three days before, the complaint did not seek money damages, specifically stating that "money damages would be inadequate and impossible to accurately ascertain."

On the same day that UTMG filed its complaint, the trial court scheduled an injunction hearing in the case for February 26. The court also issued a subpoena duces tecum to Healthcare Realty Trust, the landlord of a Memphis medical office building where Vogt was believed to have leased office space. In response to the subpoena, Healthcare Realty Trust produced a two-page document, dated February 6, 2004, that: (1) requested that the landlord design a door sign for an office suite in the building that included Dr. Vogt's name under the corporate name "Women's Health Specialists, PLLC," and (2) listed Dr. Vogt on an "Employee List" for the "Tenant" "Women's Health Specialists, PLLC."

One week later, on February 20, Dr. Vogt answered UTMG's complaint, denying that she had committed an anticipatory breach of the Agreement. She also filed a "Counterclaim in Interpleader" against UTMG, seeking, among other things, a declaratory judgment that Section 22 was void and unenforceable. Pleading in the alternative, Dr. Vogt offered to pay $194,197 into the court in the event that Section 22's buy-out option was found valid and enforceable. The trial court accepted these funds.

On the same day that Dr. Vogt answered UTMG's complaint and filed her counterclaim, three Memphis physicians, Frank W. Ling, M.D., Thomas G. Stovall, M.D., and Robert L. Summit, Jr., M.D. ("Intervenors"), filed a motion to intervene in the case, attaching to their motion a proposed complaint against UTMG. The proposed complaint made several statutory and common law claims, including unlawful restraint of trade, procurement of a breach of contract, and unlawful interference with the medical treatment of Intervenors' patients. The Intervenors' proposed complaint alleged that they had tendered their own resignations from UTMG on or about December 23, 2003 and planned to enter into a private Memphis medical practice with Dr. Vogt.[3] Although UTMG had initially given the Intervenors its consent to practice together privately, UTMG subsequently changed its position, the proposed complaint alleged, interpreting the Intervenors' employment agreements with UTMG to prohibit them from practicing medicine privately with Dr. Vogt and with each other. The Intervenors proposed three forms of relief: (1) a declaratory judgment that their respective UTMG employment agreements did not prohibit them from practicing medicine privately together; (2) an injunction that prohibited UTMG from interfering with their right to associate with each other in a private medical practice; and (3) damages.

On February 25, UTMG answered Dr. Vogt's counterclaim, denying that Dr. Vogt still had the right to "buy out" her contract and asserting that the "Agreement does preclude Dr. Vogt from entering into practice with certain other UTMG physicians for a period of one year after Dr. Vogt leaves UTMG." (emphasis in original). Additionally, at UTMG's request, the trial court cancelled the February 26, 2004 injunction hearing. It was never rescheduled. One week later, on March 2, UTMG's counsel sent a letter to the trial court, informing it that UTMG had reached "a partial settlement" with the Intervenors. Neither the letter nor any other document in the record sets forth the full terms of the settlement. On March 8, by consent of all of the parties, the trial court granted the three physicians' motion to intervene. The Intervenors also formally filed their proposed complaint against UTMG.

On March 10, UTMG gave Dr. Vogt notice that it wished to depose her. On March 11, Dr. Vogt filed a motion to dismiss UTMG's complaint, arguing that it failed to present a justiciable case or controversy. On March 12, Dr. Vogt left UTMG's employ. The same day, Dr. Vogt filed a motion for the return of the interpled funds arguing that there was no justiciable case or controversy, and therefore, the court had no reason to continue to hold the funds. In support of this contention, Dr. Vogt asserted that: (1) UTMG had filed its February 13, 2004

_____

[3] The employment contracts between UTMG and each intervenor did not contain non-competition agreements.

complaint specifically to prevent her from engaging in the private practice of medicine with the Intervenors; (2) UTMG had reached a settlement with the Intervenors, of which the court received notice in a March 2, 2004 letter to the court, noted above, and that, because of the settlement, she would not practice medicine with the Intervenors until March 15, 2005; (3) she had not actually violated Section 22 of the Agreement, even if the covenant was valid and enforceable; and (4) it was now only "pure speculation" that she would practice in violation of the Agreement. UTMG never filed a motion in response to Dr. Vogt's request to return the funds.[4] On March 19, relying on the same four arguments listed above, Dr. Vogt moved for a protective order and a stay of all discovery.

After a March 26, 2004 hearing, the trial court returned the $194,197 that Dr. Vogt had paid into the court, and granted a partial stay of discovery but permitted UTMG to take Dr. Vogt's deposition. Also on March 26, in reply to Dr. Vogt's March 11 motion to dismiss, UTMG filed a cross-motion for summary judgment,[5] contending that there was no factual dispute regarding Section 22's enforceability. In the motion, UTMG also asked the trial court to treat Dr. Vogt's motion to dismiss as one for summary judgment because her motion referred to matters outside of the pleadings.

On April 1, Dr. Vogt filed an affidavit stating that she had accepted a position as a urogynecologist in Indianapolis, Indiana, well outside the Agreement's Restricted Area. Based on this affidavit, Dr. Vogt renewed her motion for a complete stay of discovery and a protective order that would prohibit UTMG from deposing her. Taking judicial notice of the fact that UTMG "has reached a settlement with the Intervenors . . . [and that] Dr. Vogt is not going to practice with [the Intervenors] at any time prior to March 15, 2005," the trial court granted in part and denied in part Dr. Vogt's motion to stay discovery.[6] Dr. Vogt's motion to dismiss plaintiff's complaint remained pending.

On April 7, Dr. Vogt gave written notice that she wished voluntarily to nonsuit her counterclaims against UTMG. The trial court did not act on this notice for more than four months.[7] Throughout the rest of April 2004, UTMG twice more gave Dr. Vogt notice of its

---

[4] UTMG addressed Dr. Vogt's request for the return of the interpled funds in a pleading titled "Plaintiff/Counter-Defendant's Response to Motion for Protective Order and for Stay of Discovery," but failed to address the issues pled in Vogt's "Motion for Return of Interpled Funds."

[5] UTMG's "cross motion" for summary judgment was filed in response to Dr. Vogt's motion to dismiss, claiming that Dr. Vogt's motion to dismiss should have actually been a motion for summary judgment. We refer to UTMG's motion as a cross-motion solely because that is how the motion was styled in the trial court.

[6] In light of the facts before the trial court, UTMG was allowed to move forward with its Notice of Deposition, but was prohibited from asking Dr. Vogt about anything relating to Women's Health Specialists, PLLC, and Drs. Ling, Stovall, and/or Summitt.

[7] At the time of this lawsuit, written notice of the intent to nonsuit was sufficient to dismiss Dr. Vogt's counterclaims. See Tenn. R. Civ. P. 41.01 (2004). It was not until July 1, 2004, that "[a] voluntary nonsuit to dismiss

intention to depose her in accordance with the trial court's standing discovery order permitting a deposition. Dr. Vogt did not cooperate. As a result, UTMG filed a motion to compel Dr. Vogt's deposition and to sanction her for her failure to cooperate. After an April 23 hearing on the motion to compel, the trial court granted Dr. Vogt a complete stay of discovery until it resolved her motion to dismiss.

Also on April 23, Dr. Vogt filed a second affidavit. In this affidavit, Dr. Vogt stated, "I am not going to engage in the practice of medicine in Shelby County, Tennessee, or within a 150-mile radius of Shelby County, Tennessee, before March 15, 2005." (emphasis in original). Unlike the affirmation in her April 1, 2004 affidavit, Dr. Vogt made no reference to her specific employment plans.

On April 30 and May 14, the trial court held hearings on Dr. Vogt's motion to dismiss and UTMG's opposing motion for summary judgment. The trial court accepted Dr. Vogt's argument that UTMG's suit failed to present a continuing controversy and dismissed the case. The trial court also denied UTMG's motion for summary judgment. At both of these hearings, UTMG argued that Dr. Vogt's motion to dismiss should be treated as a motion for summary judgment because her motion to dismiss referred to matters outside of the pleadings, primarily the Intervenors' settlement with UTMG and Dr. Vogt's two affidavits concerning her future employment plans. Following the May 14 hearing, the trial court entered an order granting Dr. Vogt's motion to dismiss and denying UTMG's cross-motion for summary judgment. Following the order, UTMG filed a motion asking the court to reconsider its grant of Dr. Vogt's Motion to Dismiss.

On May 28, 2004, UTMG moved to amend its complaint to include, for the first time, a claim that Dr. Vogt owed UTMG the buy-out amount of $194,197 because, in her counterclaim, she had allegedly "emphatically and unequivocally" elected to accept the Section 22(b) buy-out option. UTMG requested this amendment more than three months after it had refused to accept Dr. Vogt's voluntary offer of the same buy-out price and had entered into a "partial agreement" with the Intervenors, thus preventing Dr. Vogt from practicing with the Intervenors for one calendar year. The amendment also came seven weeks after Dr. Vogt filed a notice of dismissal of the counterclaim upon which UTMG relied.

After yet another hearing, on June 4, the trial court amended its dismissal order, identifying Dr. Vogt's motion to dismiss as a motion for summary judgment and ordering Dr. Vogt to file a statement of undisputed facts. The trial court did not disturb its denial of UTMG's motion for summary judgment and did not lift the stay of discovery.

On June 25, UTMG filed a second motion for summary judgment, repeating its contention that its employment contract with Dr. Vogt was valid and enforceable, and that it was

_____

an action without prejudice must be followed by an order of voluntary dismissal signed by the court . . . ." Tenn. R. Civ. P. 41.01(3) (2005).

entitled to the $194,197 Section 22(b) buy-out price. On June 28, the trial court denied UTMG's motion to amend, concluding that the proposed amendment "would cause undue prejudice to Dr. Vogt."

On August 10, Dr. Vogt filed her statement of undisputed material facts, asserting therein that she had left UTMG's employ on March 12, 2004, had subsequently accepted a position to practice medicine in Indianapolis, and therefore, would not be practicing medicine in violation of the Agreement. Before responding to Dr. Vogt's statement, UTMG moved the trial court to lift the stay of discovery. The trial court refused.

On September 15, the trial court entered an order granting Dr. Vogt a voluntary nonsuit on her counterclaims pursuant to her April 7, 2004 notice. At this point, UTMG's second motion for summary judgment, discussed above, was still pending. Finally, on November 1, the trial court granted Dr. Vogt's converted motion for summary judgment and denied UTMG's second motion for summary judgment. In its order, the trial court noted that UTMG originally had asked only for two specific forms of relief, an injunction and a declaration of Section 22's validity. After UTMG had, in essence, abandoned its pursuit of an injunction, the trial court reasoned that it found itself with only UTMG's request for a declaratory judgment to consider. Recognizing that Tennessee law requires a justiciable question to exist before a court can grant a request for a declaratory judgment, the trial court held that:

> Neither in its Complaint nor in any other pleading filed in this case has UTMG alleged that [Dr.] Vogt has practiced medicine with anyone in Shelby County, Tennessee or within a 150-mile radius of Shelby County, Tennessee, other than with UTMG.

> Because there is no allegation that [Dr.] Vogt was ever employed by any other medical group in Shelby County, Tennessee or within 150 miles of Shelby County, Tennessee other than [with] UTMG, there is no dispute as to any material fact and [Dr.] Vogt is entitled to a judgment as a matter of law, there being no justiciable case or controversy to sustain the declaratory judgment action.

UTMG timely appealed. The Court of Appeals reversed the trial court's grant of summary judgment and remanded the case to the trial court, concluding that the trial court should have given UTMG more time for discovery. The Court of Appeals did not address the threshold question of the case's justiciability. We accepted Dr. Vogt's application to appeal to determine whether UTMG's suit for declaratory relief presented a justiciable case or controversy.[8]

---

[8] UTMG also filed an application to appeal, but that application was denied. The issues raised in that application were decided correctly by the trial court.

## DISCUSSION

### Standard of Review

We review a trial court's grant of summary judgment de novo. See Blair v. W. Town Mall, 130 S.W.3d 761, 763 (Tenn. 2004). Based on the parties' respective statements of undisputed facts, see Tenn. R. Civ. P. 56.03, and "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," a grant of summary judgment is appropriate only when (1) there is no genuine issue with regard to the material facts relevant to the claim or defense contained in the motion, and (2) based on undisputed facts, "the moving party is entitled to a judgment as a matter of law," id. 56.04. See also W. Town Mall, 130 S.W.3d at 764. When we construe a written contract, we do so de novo. See, e.g., Barnes v. Barnes, 193 S.W.3d 495, 498 (Tenn. 2006).

### Justiciability

The principal purpose of the Declaratory Judgment Act is "to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations . . . ." Tenn. Code Ann. § 29-14-113 (2000). And, although the Act is "to be liberally construed and administered," id., at times, we have determined that "some limitations must be placed upon the operation of the statute." City of Johnson City v. Caplan, 253 S.W.2d 725, 726 (Tenn. 1952). See also Super Flea Mkt. of Chattanooga, Inc. v. Olsen, 677 S.W.2d 449, 451 (Tenn. 1984) (stating that a declaratory judgment action cannot be used to "allay fears as to what may occur in the future"); Miller v. Miller, 261 S.W. 965, 971 (Tenn. 1924) (holding that a declaratory judgment action cannot be used to decide a theoretical question). Thus, in order to sustain an action for a declaratory judgment, a justiciable controversy must exist. Jared v. Fitzgerald, 195 S.W.2d 1, 4 (Tenn. 1946).

To be justiciable, a case must involve presently existing rights, live issues that are within a court's jurisdiction, and parties who have a legally cognizable interest in the issues. See State v. Brown & Williamson Tobacco Corp., 18 S.W.3d 186, 193 (Tenn. 2000). A case is not justiciable if it does not involve a genuine, existing controversy requiring the adjudication of presently existing rights. See State ex rel. Lewis v. State, 347 S.W.2d 47, 48-49 (Tenn. 1961).

From the onset of this dispute, UTMG has argued that a justiciable controversy exists because Dr. Vogt committed an anticipatory repudiation of the Agreement. UTMG bases its anticipatory breach claim on: (1) Dr. Vogt's January 14, 2004 e-mail to Dr. Woodside, which stated that she "plan[ned] to engage in the practice of medicine locally"; and (2) evidence that Dr. Vogt had "leased space . . . with the intent of establishing an office for the professional practice of medicine . . . [within the Restricted Area]." Thus, to determine whether there is a justiciable controversy in this case, we must determine whether Dr. Vogt committed an anticipatory breach of her employment contract.

Anticipatory Repudiation

A party to a contract can take certain actions or make certain statements that repudiate it. Such a repudiation can occur when a party "commit[s] a voluntary act which renders the party unable or apparently unable to perform the contract," Wright v. Wright, 832 S.W.2d 542, 545 (Tenn. Ct. App. 1991); see Restatement (Second) of Contracts § 250 (1979), or when "the words and conduct of the contracting party . . . amount to a total and unqualified refusal to perform the contract." Wright, 832 S.W.2d at 545; see Ky. Home Mut. Life Ins. Co. v. Rogers, 270 S.W.2d 188, 194-95 (Tenn. 1954); Brady v. Oliver, 147 S.W. 1135, 1139 (Tenn. 1911); Wilkins v. Third Nat. Bank in Nashville, 884 S.W.2d 758, 761 (Tenn. Ct. App. 1994). An indication that more negotiations are sought is not a total and unqualified refusal to perform. See Palmiero v. Spada Distr. Co., 217 F.2d 561, 565 (9th Cir. 1954) (holding that "an anticipatory breach of contract is not established by a negative attitude or one which indicates that more negotiations are sought").

When a repudiation occurs before the time that a contract requires a party to perform, the repudiating party has committed an "anticipatory repudiation" or an "anticipatory breach" of the contract. See Church of Christ Home for Aged v. Nashville Trust Co., 202 S.W.2d 178, 183 (Tenn. 1947); 23 Samuel Williston, Treatise on the Law of Contracts § 63.29 (Richard A. Lord ed., 4th ed. 2002). Believing that another party has committed an anticipatory breach of a contract, the non-breaching party may elect to take one of three courses of action: (1) rescind the contract and pursue remedies based on a rescission; (2) treat the repudiation as an immediate breach by bringing suit or changing position in some way; or (3) await the time for performance of the contract and bring suit after that time has arrived. Williston on Contracts at § 63.33; see Tower Investors, LLC v. 111 East Chestnut Consultants, Inc., 864 N.E.2d 927, 940 (Ill. App. Ct. 2007).

If the non-breaching party elects to sue on the anticipatory breach, then his anticipatory breach cause of action, if proven, entitles the non-breaching party to a remedy for an *actual* breach of the contract, as if the anticipatory breach had occurred after the time for performance had arrived. See, e.g., Roehm v. Horst, 178 U.S. 1, 9 (1900); Tower Investors, 864 N.E.2d at 940; Bourke v. Western Bus. Prods., 120 P.3d 876, 883 (Okla. Civ. App. 2005); Weitzel v. Sioux Valley Heart Partners, 714 N.W.2d 884, 894 (S.D. 2006). Under this logic, courts will sometimes refer to an "anticipatory breach" of contract as a "constructive breach." See Black's Law Dictionary 182 (7th ed. 1999).

In the instant case, the Agreement plainly establishes that the date on which Dr. Vogt was required to begin to abide by Section 22's restrictions was the date Dr. Vogt "[wa]s terminated" from UTMG's employ. Because UTMG brought its suit a month before Dr. Vogt left UTMG's employ, UTMG elected to treat Dr. Vogt's actions up to the date of the complaint as an anticipatory breach of the Agreement and sought a remedy under the contract *as if* Dr. Vogt had *actually* breached the contract. Having made this election, the dispositive legal question before the trial court became, "Did Dr. Vogt commit an anticipatory repudiation of her

covenant not to practice medicine within the Restricted Area for a year after leaving UTMG's employ?"

With the proper legal question in focus, we conclude that there is no genuine issue of material fact in this case, and therefore, Dr. Vogt is entitled to judgment as a matter of law. Neither of the key pieces of evidence upon which UTMG based its original claim—Dr. Vogt's January 14, 2004 e-mail to Dr. Woodside or the Heathcare Realty Trust documents—demonstrate that Dr. Vogt committed an anticipatory breach of her contract.

In Dr. Vogt's January 14, 2004 e-mail to Dr. Woodside she stated, "After much consideration, I plan to engage in the practice of medicine locally. . . . I wish to discuss the buy-out and the possible mechanisms that address the non-competition component of my contract." Although the e-mail was certainly a voluntary act, its plain language gives no indication that Dr. Vogt was unable to perform under her Agreement with UTMG or that she had totally and without qualification refused to perform her obligations under the Agreement. To the contrary, the e-mail makes it clear that she had every intention to perform her duties under the contract by engaging in the Section 22(b) buy-out process. This intent was reaffirmed after UTMG filed its complaint when Dr. Vogt interpled funds into court that would have satisfied her obligations under the Section 22 buy-out option.

We also do not find the Healthcare Realty Trust documents sufficient to establish that Dr. Vogt anticipatorily breached the Agreement. We find that neither the proposition that Dr. Vogt's name was slated to appear on a sign under the firm name "Women's Health Specialists, PLLC" nor that she was listed on a landlord's administrative form as an employee of the firm to be a breach of the Agreement.

Instead, we find the actions of Dr. Vogt and the dates on which they occurred to be clear, undisputed proof that Dr. Vogt did not anticipatorily breach the Agreement. The Healthcare Realty Trust documents were dated February 6, 2004. That fact shows only that, as of this date, Dr. Vogt possibly intended to practice medicine within the Restricted Area. But, as late as February 10, 2004, Dr. Vogt was still actively pursuing her options with UTMG under the Section 22 buy-out provision. The intent to practice within the Restricted Area coupled with the intent to engage in the buy-out option was not in violation of the Agreement's terms.

Furthermore, although Dr. Vogt's original intent might have been to work within the Restricted Area, this intent changed, or at least became less certain, when UTMG reached "a partial settlement" with the Intervenors. Although the full terms of the agreement were never introduced to the trial court, the trial court took judicial notice of the fact that the Intervenors would not practice together with Dr. Vogt until March 15, 2005.[9] Following this agreement and

---

[9] March 15, 2005 was a year and three days after Dr. Vogt left her employ with UTMG. The Agreement restricted Dr. Vogt's employment in the Restricted Area for only one calendar year.

-11-

after her employ with UTMG ceased, Dr. Vogt announced her intention to practice outside the Restricted Area.

Accordingly, following UTMG's partial settlement with the Intervenors, the undisputed facts in this case were as follows: Dr. Vogt left UTMG's employ on March 12, 2004. The Agreement's non-compete covenant took effect as of this same day and lasted until March 12, 2005. On April 1, 2004, Dr. Vogt filed an affidavit with the trial court stating that she had accepted a position as a urogynecologist in Indianapolis, Indiana, well outside the Agreement's Restricted Area. In a subsequent affidavit, Dr. Vogt stated that she was "not going to engage in the practice of medicine [within the Restricted Area] before March 15, 2005." (emphasis in original). Neither in the original complaint nor in any subsequent pleadings before the trial court did UTMG allege any fact that demonstrated that Dr. Vogt had anticipatorily breached the Agreement's non-competition covenant.

In an attempt to supplement the record to show that Dr. Vogt actually breached the Agreement, UTMG attached documents to its brief that, it contends, demonstrate that Dr. Vogt has not abided by the Agreement's Section 22.[10] None of these documents, however, appear in the appellate record and are not properly before us. See Sherrod v. Wix, 849 S.W.2d 780, 783 (Tenn. Ct. App. 1992); see also Tenn. R. App. P. 13(c) ("The Supreme Court . . . may consider those facts established by the evidence . . . and set forth in the record.").

## CONCLUSION

Because Dr. Vogt did not commit an anticipatory repudiation of the Agreement and thus no justiciable controversy was ever before the trial court, she was entitled to summary judgment. As such, we vacate the decision of the Court of Appeals and remand the case to the trial court for the entry of an order dismissing the case.

We tax this appeal's costs to UT Medical Group, Inc., for which execution may issue, if necessary.

_____
CORNELIA A. CLARK, JUSTICE

---

[10] It is important to note that, had Dr. Vogt actually breached the Agreement at any time between March 12, 2004 and March 12, 2005, UTMG could have filed a cause of action for breach of contract.

-12-