IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 5, 2025 Session

## DANIEL EWALD v. TETYANA EWALD

**Appeal from the Chancery Court for Montgomery County**
**No. DI 21-130      Matthew Joel Wallace, Judge**

_____

**No. M2024-00381-COA-R3-CV**

_____

Husband and Wife divorced. In ruling upon contested matters, the trial court adopted a parenting plan submitted by Husband with minor modifications, named Husband primary residential parent of the parties' minor children, and granted Husband primary custody of his stepson. The trial court ordered Wife to pay child support and declined to grant her alimony. The court also categorized and distributed the parties' marital property. The court denied Wife's request to hold Husband in contempt for purportedly interfering with her parenting time. Because the parties agree there was error as to Wife's income for purposes of the child support calculation and agree as to the number that should have been used for her income, we modify the trial court's award of child support accordingly. We also conclude that the trial court erred in failing to value the marital property and to apply the statutory factors and make relevant findings in connection with dividing the marital estate. We conclude that the issue of primary custody over Husband's stepson, who was nearly 18 at the time of argument in this case, is moot. We affirm as to the other issues presented in this appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part; Modified in Part; Vacated in Part; Remanded**

JEFFREY USMAN, J., delivered the opinion of the court, in which W. NEAL MCBRAYER and CARMA DENNIS MCGEE, JJ., joined.

Daniel P. Bryant, Clarksville, Tennessee, for the appellant, Tetyana Ewald.

Roger A. Maness and Colleen Hyder, Clarksville, Tennessee, for the appellee, Daniel Ewald.

**OPINION**

# I.

Daniel Ewald (Husband), a member of the United States Army, met Tetyana Ewald (Wife), who was from Ukraine, in 2014. They met while Husband was on deployment in Jordan, which is where Wife was residing at the time. Within months of meeting, Husband and Wife married, and Wife came to the United States for the first time. Nearly seven years later, Husband filed for divorce from Wife, and Wife responded with her own counter-complaint for divorce.

Husband and Wife contested multiple issues before the trial court. Both sought an equitable division of marital assets and debts and a parenting plan providing for the two minor children born of the marriage. Husband also sought visitation with his minor stepson, Wife's child from a prior relationship. Wife sought alimony. The court heard testimony on these matters at trial from Husband, Wife, Husband's stepson, Husband's parents, Wife's mother, and two of Wife's friends.

The parties both testified regarding complications in their relationship stemming from Wife's interactions with Husband's ex-wife and his daughter from his previous marriage. According to Husband, Wife had asked him "many times" to abandon his relationship with his daughter. Husband believed the relationship between Wife and his daughter was "not at all a healthy" one. In his view, "there was a lot of resentment on [Wife's] behalf toward" his daughter, whom Wife treated "like the scapegoat." He also testified that his daughter "was afraid of [Wife]." For her part, Wife testified that she felt "there [was] a psychological problem" with Husband's daughter. Furthermore, she considered the daughter's custody case as "a huge problem in [their] family" because, in her view, Husband had "decided to take this child from her mother for no reason" and "against [Wife's] will."

According to Husband, after a fight between Wife and Husband's ex-wife turned physical, Wife issued an ultimatum that Husband could either leave with his daughter or stay with Wife and her children. Wife also "started to become destructive." Husband described one incident in which Wife allegedly "said she was going to go have [Husband's] funeral" and "burned half of [his] clothing" in their firepit. In another, "she smashed [his] truck" with an iron skillet and a sledgehammer, causing thousands of dollars in damage.

For her part, Wife testified that she was in control of herself and knew what she was doing during these events. She admitted that she "burned the stuff," including some of Husband's clothes and art he had given her, as a symbolic "bye-bye to him" after he had publicly insulted her. As for the truck, she indicated that her "intention wasn't to damage [it]," but instead "to let [her] regret about this man to go out," which she felt "successful" in doing.

Husband and Wife offered dramatically divergent accounts of Wife's interactions with him and his extended family. According to Husband, Wife once threw his personal items out of his truck's window while he was driving, and she hit him until he bled. Wife denied hitting Husband during the incident. In her telling, Husband had taken her phone, and she "probably, maybe touched him" while trying to get it back. She claimed that after they both exited the vehicle, he "grabbed" her, and she pushed him away to protect herself. Husband's father testified that Wife had once also "swung at" him and "hit [him] in the face" when he reached out to take one of the children from her during an exchange. Wife countered that she pushed him away and cursed at him because she felt that "he was grabbing" at her and "touched" her while reaching for the child. Husband's mother testified about another event in which Wife pushed and "attacked" her in order to get into Husband's apartment. Addressing this incident, Wife attempted to justify her actions by explaining that, even though Husband's mother had asked her to leave the apartment, Wife did not "have to listen to her [because] she's nobody to [Wife]." The altercation escalated, eventually resulting in Husband's mother throwing Wife's phone, grabbing her neck, and pushing her against a wall.

Following her fight with Husband's mother, Wife concluded that it would be inappropriate for Husband to allow the children near their paternal grandmother anymore. The next time Husband drove the children to his parents' home, several states away, Wife followed in her own vehicle. Wife brought her minor son from her prior marriage on the hours-long drive, justifying this by stating she wanted her son to "see who he's trusting" and describing Husband's family as "the liars." Husband and his parents testified that, from inside their house, they observed Wife climb into the back of Husband's truck and yell loudly in Russian while her minor son observed from Wife's vehicle. At trial, Wife rationalized her actions by noting that Husband's truck was her truck as well, so she could be there if she so desired. She claimed that she had been yelling in Russian because she had just learned about the destruction of her premarital home in Ukraine.

Wife testified that she did not know how many times she had been arrested for similar interpersonal incidents. At least one criminal charge resulting from her fights with Husband's family remained pending as of trial in the present case. Additionally, as a result of Wife's actions during the divorce proceedings, the court entered an order of protection for Husband against Wife for stalking him. Wife claimed that she was making changes though, including going to therapy, taking a class regarding "emotion[al] violence," and starting a parenting class.

Wife's mother, who had moved from Ukraine to live with Husband and Wife, testified in support of Wife. She explained that she depended on Wife for "everything" and that she often helped Wife with childcare in exchange for continuing their living arrangement. When questioned about Wife's alleged bad behavior toward her and others, Wife's mother excused many of Wife's actions as having been misinterpreted. Wife's mother also testified that she viewed Wife's threats to have her deported as jokes. Wife's

- 3 -

mother also denied that Wife had ever assaulted or threatened her, despite evidence that the police had once arrested Wife for threatening and assaulting both her and Wife's son. Addressing the incident with her son, Wife testified that she did not assault her son. She instead insisted that he "fell down on [her] by inertia, and he hit [her] with his phone in the face." As for her mother, Wife indicated that she had only "kind of, like, push[ed]" her mother in order to direct her to move.

During the divorce proceedings, Husband retired from his career with the military in order to make more time for increased parenting responsibilities. His military service had previously required him to leave the children in Wife's sole care during several months-long trainings and deployments, but his new employment at a fire station had a more lenient schedule generally consisting of 24-hours-on, 48-hours-off. Husband hoped to be named primary residential parent and to keep all the children together, including his stepson, as the siblings were "bonded with each other." Husband testified that he had raised Wife's child from her prior relationship, who did not have a significant relationship with his biological father, "as a son." Wife's son agreed that he saw Husband as his father and that he called Husband "Pop" or "Papa." He testified that he wanted both parents in his life, but he would prefer to live with his stepfather, Husband, rather than with Wife.

Husband submitted an itemized income and expense statement showing a monthly surplus after paying all regular expenses for himself and the children. He earned approximately $9,000 per month from his work plus military retirement and disability. The most significant marital asset was the parties' home, which he believed was worth between $375,000 and $380,000. Approximately $213,000, however, remained owing on it. Husband said he was prepared to buy Wife out of the equity in the home if permitted.

Wife testified that she was working for 40 hours each week and earning $23 per hour, and she sometimes worked an additional freelancing job at a rate of $17 per hour. She was uncertain of her regular expenses. She indicated that Husband was paying the mortgage, electricity, water, and insurance bills on the home in which she resided. Wife estimated that the mortgage was $1,500 and that the other bills were "up to $600, maybe $500" in the winter and "even less" in the summer. She claimed that she owed around $12,000 on her vehicle, which she thought might be worth $24,000. She also claimed that she paid for her mother's medical bills and son's insurance. She provided no other information about necessary expenses or her financial need. As for the marital home, she agreed that Husband made the "correct statement" of its worth. She wanted to remain living there but did not have any idea of what should be done with the home equity. She stated that "whatever the judge will decide, I will do."

Husband indicated that he had received a reenlistment bonus shortly before filing for divorce and that he had removed funds from a joint account to a separate account to which Wife did not have access. Wife testified that Husband had removed $100,000 from

a joint account and used $20,000 of that amount to pay off his truck. She indicated he had hidden the rest of the money.

The court granted Husband a divorce on the grounds of inappropriate marital conduct. It also found "a significant existing relationship between [Husband] and [Wife's son, his stepson]" as well as a significant relationship between Wife's son and the minor children born of the marriage, such that the child was in "danger of substantial mental and emotional harm" if visitation were not permitted. *See* Tenn. Code Ann. § 36-6-303(a)(1) (authorizing courts to order stepparent visitation in certain "extraordinary cases"). The court determined that it would consider the best interests of all three children together.

In analyzing the relevant statutory factors for the best interests of the children, the court adopted a permanent parenting plan substantially similar to Husband's proposed plan. *See* Tenn. Code Ann. § 36-6-106(a) (effective July 1, 2016, to June 30, 2021).[1] Husband was named primary residential parent of all three children, who would reside with him for 285 days each year, while Wife would receive 80 residential parenting days. Husband also received sole decision-making for educational and non-emergency healthcare decisions. The court added several special provisions relating to parental communication and exchanges, including a provision that each parent would have a right of first refusal to care for the children overnight whenever the other parent was unavailable to do so during his or her scheduled parenting time.

Based on the parenting plan and the applicable child support worksheet, the court ordered Wife to pay Husband $620 in child support each month. *See* Tenn. Comp. R. & Regs. 1240-02-04-.03 (explaining the "Income Shares Model" and steps for determination of a parent's basic child support obligation in Tennessee), -.04(1)(a)-(b) (mandating use of a Child Support Worksheet for the calculation of a parent's child support obligation); -.08 (instructions for completing the Child Support Worksheet). It then classified and divided the parties' property as follows:

> 3. Nonmarital property: Husband's North Carolina real property and/or proceeds is not marital property, and as such, is not subject to division. Any real property owned by Wife located in Ukraine is not marital property, and as such, is not subject to division.

---

[1] *See Cotten v. Cotten*, No. M2023-01282-COA-R3-CV, 2025 WL 2505461, at *6 n.1 (Tenn. Ct. App. Sept. 2, 2025) ("We apply the version of the statute in effect when [Husband] filed this divorce action."); *see also In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017) ("[T]he version of the statute in effect at the time of the petition's filing controls this action.").

4. Personal property: [Husband] is awarded his weapons, military gear, tools and separate property from the home and garage. [Wife] is awarded the remaining personal property.

5. Debts: heretofore existing in a responsive party's name shall be their respective debt, each party holding the other harmless therefrom.

6. Retirement: Wife is entitled to a portion of Husband's military retirement. The Court finds the duration of marriage to represent One Hundred Eight (108) months divisible by Husband's creditable service of 21 years and 11 months.

7. Marital home: The Court finds that parties' [marital residence] to have a net equity in the amount of One Hundred Sixty Thousand Dollars, with Wife's share at fifty (50%) percent. Husband has the following two options with regard to the home: Due to [Husband's] stated interest in residing in the home at minimum until the oldest child graduates [high school], he may 1. elect to refinance the home now with Wife's share to be reimbursed from proceeds of the refinance, or 2. elect to sell the home within sixty (60) days of the oldest child graduating high school, but shall pay to Wife 50% of the net equity resulting from the sale.

After entry of the final decree, Wife moved to alter or amend the final order in numerous respects, and she also sought to hold Husband in contempt for allegedly interfering with her parenting time with her son. The court denied both requests.

Wife appeals. With regard to parenting, Wife contends that the trial court erred by designating Husband as the primary residential parent, by adopting his proposed parenting plan, and by granting Husband primary custody over her son from a prior relationship. We note that Wife's son was almost 18 when this case was argued before this court. Wife also asserts the trial court erred as to her income for purposes of calculating her child support obligations. As to the marital estate, Wife insists that the trial court erred by failing to value the marital property and by failing to apply the relevant statutory factors or make findings to support its division of the marital estate. Wife also contends that the trial court erred by denying her motion for contempt against Husband. Additionally, she argues that the trial court erred in failing to award her alimony.

In considering this appeal, including reading the parties' briefs and reviewing the record, it became apparent that the trial court had not disposed of Wife's claim for alimony or the parties' competing claims for attorney's fees. Accordingly, this court entered an order directing the trial court to address these issues. The trial court, in response, denied

the claims for alimony and attorney's fees.[2]  This court invited further briefing from the parties and offered a timeline for competition of this briefing.  No supplemental briefing was filed by either party.

## II.

Wife raises the issue of whether the trial court erred in granting Husband primary custody of Wife's son from a prior relationship.  As a threshold matter, we "must first consider questions pertaining to justiciability" of this issue "before proceeding to the merits of any remaining claims."  *City of Memphis v. Hargett*, 414 S.W.3d 88, 96 (Tenn. 2013) (citing *UT Med. Grp., Inc. v. Vogt*, 235 S.W.3d 110, 119 (Tenn. 2007)).  The justiciability doctrines "provide criteria for determining whether the courts should hear and decide a particular case."  *Norma Faye Pyles Lynch Family Purpose LLC v. Putnam Cnty.*, 301 S.W.3d 196, 202 (Tenn. 2009).  Among these is the mootness doctrine, which the Tennessee Supreme Court has described as follows:

> A case must remain justiciable (remain a legal controversy) from the time it is filed until the moment of final appellate disposition.  While the doctrines of standing and ripeness focus on the suit's birth, the doctrine of mootness focuses attention on the suit's death.  A moot case is one that has lost its justiciability either by court decision, acts of the parties, or some other reason occurring after commencement of the case.  A case will be considered moot if it no longer serves as a means to provide some sort of judicial relief to the prevailing party.

*Id.* at 203-04 (citations omitted).

An issue may lose justiciability and thereby become moot during the pendency of a case.  *Lufkin v. Bd. of Prof'l Resp. of the Sup. Ct.*, 336 S.W.3d 223, 226 (Tenn. 2011).  Tennessee courts have previously concluded that parenting issues have been mooted by children reaching the age of majority.  *See, e.g., Niemeyer v. Niemeyer*, No. E2022-01690-COA-R3-CV, 2024 WL 1645829, at *10 (Tenn. Ct. App. Apr. 17, 2024).  In the present case, Wife's son turned 18 shortly after oral argument and during the pendency of this

---

[2] The trial court responded with a brief order, which stated:

> . . . on October 8, 2025, the trial court conducted a phone conference regarding the order with all counsel in the matter.

> It was and is this Court's intent to deny any relief not specifically granted in its prior order, to include claims for attorney's fees and alimony.  To the extent not already denied, claims for attorney's fees and alimony are hereby respectfully denied.

appeal.  We therefore conclude a challenge as to the trial court's award of primary custody of Wife's son to Husband is moot.

III.

Wife also contends that the trial court erred in fashioning the parenting plan's residential parenting schedule as to the two minor children born of the marriage and in designating Husband the primary residential parent.  Decisions regarding parenting plans are factually driven, and thus, "determining the details of parenting plans is 'peculiarly within the broad discretion of the trial judge.'" *Armbrister v. Armbrister*, 414 S.W.3d 685, 693 (Tenn. 2013) (quoting *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988)).  We will not reverse the court's decision absent an abuse of discretion. *Id.*; *Eldridge v. Eldridge,* 42 S.W.3d 82, 88 (Tenn. 2001) ("It is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court.").  "An abuse of discretion occurs when the trial court applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *West v. Schofield*, 460 S.W.3d 113, 120 (Tenn. 2015).

"The paramount concern in establishing a permanent parenting plan is the best interest of the children." *Maupin v. Maupin*, 420 S.W.3d 761, 770 (Tenn. Ct. App. 2013) (citing Tenn. Code Ann. § 36-6-401(a)).  The determination of a child's best interest presents a question of fact. *Armbrister*, 414 S.W.3d at 692.  The Tennessee Supreme Court has "emphasized the *limited* scope of review to be employed by an appellate court in reviewing a trial court's factual determinations in matters involving child custody and parenting plan developments." *C.W.H. v. L.A.S.*, 538 S.W.3d 488, 495 (Tenn. 2017).  Additionally, the Tennessee Supreme Court has indicated that

> trial courts enjoy broad discretion in formulating parenting plans.  Thus, determining the details of parenting plans is peculiarly within the broad discretion of the trial judge.  Appellate courts should not overturn a trial court's decision merely because reasonable minds could reach a different conclusion.

*Id*. (citations and quotations omitted).  Accordingly, in reviewing the trial court's decisions regarding such matters, Tennessee appellate courts "should reverse custody decisions 'only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence.'" *Id*. (citation and quotation omitted).

In challenging the trial court's decisions, Wife contends that the court abused its discretion by incorrectly weighing the statutory factors regarding the best interests of the

children. Specifically, she challenges the trial court's determination in connection with factors (1), (2), (9), (12), (14). These include:

(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

. . .

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

. . .

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

. . .

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules . . . .

Tenn. Code Ann. § 36-6-106(a) (effective July 1, 2016 to June 30, 2021).[3]

---

[3] The other factors to be considered by the trial court in analyzing the best interests of the children under Tennessee Code Annotated section 36-6-106(a) include:

. . .

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

Wife challenges trial court's analysis of Factor (2), which the court found weighed in favor of Husband. In considering Factor (2), as noted above, a court evaluates each parent's "past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child[ren] and both of the child[ren]'s parents . . . ." Tenn. Code Ann. § 36-6-106(a)(2). In the present case, the trial court concluded that it had "concerns . . . with regards to [Wife's]" willingness to coparent, stating that, "given the level of acrimony that clearly exists between the parties, co-

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

. . .

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

. . .

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

. . .

(15) Any other factors deemed relevant by the court.

- 10 -

parenting will continue to be a struggle." Wife seeks to recharacterize much of what the trial court found concerning regarding her conduct as mere "incidents of passionate display" on her part or as part of an overall "volatile relationship." She suggests Husband would not have reconciled with her on multiple occasions prior to the divorce if her conduct had truly been egregious. However, the trial court found that Wife had engaged in significant destruction of Husband's property, including the incident she referred to as "his funeral," and awarded Husband an order of protection against Wife that was continued in the final order. From our review of the record, the evidence does not preponderate against the trial court's finding as to concern regarding Mother's conduct or the trial court's conclusion that coparenting favors Father.

Wife also contends that Factors (1) and (14) should have weighed in her favor based on the parties' past and present work schedules and related parenting roles. Factor (1) requires a court to consider "[t]he strength, nature, and stability of the child[ren]'s relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child," and Factor (14) specifically directs the court to review "[e]ach parent's employment schedule." Tenn. Code Ann. § 36-6-106(a)(1), (14). In Wife's view, her parenting during Husband's past deployments should have weighed more heavily in her favor, and the trial court should have found that Husband's current 24-hours-on, 48-hours-off work schedule with the fire department "work[ed] against him." In the present case, the trial court did consider that Wife had "served in a primary parenting role" during Husband's deployments. The trial court also observed, however, that Mother's parenting role was more substantial prior to the grandmother's arrival in the United States. Additionally, the trial court "credit[ed] [Husband's] testimony considerably with regards to his primary parenting role" when not deployed. Additionally, the court considered the differences between both parents' work schedules and concluded that Husband's schedule warranted the addition of a provision outlining a right of first refusal any time either parent was unable to care for the children overnight. From our review of the record, we cannot say that the record preponderates against the trial court's findings as to these factors.

Finally, Wife argues that Factors (9) and (12) should have weighed in her favor based on her familial relationships. Factor (9) focuses on "[t]he child[ren]'s interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child[ren]'s involvement with the child[ren]'s physical surroundings, school, or other significant activities." Tenn. Code Ann. § 36-6-106(a)(9). Similarly, Factor (12) evaluates "[t]he character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child." Tenn. Code Ann. § 36-6-106(a)(12). The court found Factor (9) relevant for purposes of granting Husband parenting time with his stepson, but it found Factor (12) inapplicable. Mother notes that she lives with the children's maternal grandmother, whom Husband has entrusted with the children and who has a positive relationship with the children. Additionally, Wife notes Husband had a positive perception of Wife's mother. Assuming that the grandmother

residing with Wife weighs in Wife's favor, this would still not change the overall best interest analysis to such an extent so as to render the trial court's ruling an abuse of its discretion.

The trial court's ruling ultimately plainly reflects the trial court's concern with Mother's volatility and the negative impact of that volatility on the children. Given the discretion afforded to the trial court, having considered the arguments and reviewed the record, we simply cannot conclude that the trial court abused its discretion in the allocation of parenting time or in the designation of the primary residential parent in the present case.

IV.

Wife also contends the trial court abused its discretion in setting her income for purposes of calculating child support and thus erred in its final child support order. Husband concedes that Wife is correct on this point.

"The process and criteria for ascertaining a parent's child support obligation [are] governed by Child Support Guidelines promulgated by the Tennessee Department of Human Services, in accordance with Tennessee Code Annotated § 36-5-101(e)." *Reeder v. Reeder,* 375 S.W.3d 268, 275 (Tenn. Ct. App. 2012); *see also* Tenn. Comp. R. & Regs. 1240-02-04-.04 (Tennessee Child Support Guidelines). Application of the guidelines results in a presumptive award of child support, *Richardson v. Spanos,* 189 S.W.3d 720, 725 (Tenn. Ct. App. 2005), from which the trial court may deviate, so long as it "make[s] a written finding that the application of the child support guidelines would be unjust or inappropriate in that particular case " and provides "a justification for the variance from the guidelines." Tenn. Code Ann. 36-5-101(e)(1)(A) (effective May 10, 2019, to Mar. 28, 2021); *see* Tenn. Comp. R. & Regs. 1240-02-04-.07.

The Child Support Guidelines provide a Child Support Worksheet, the use of which is "mandatory in order to ensure uniformity in the calculation of child support awards pursuant to the rules." Tenn. Comp. R. & Regs. 1240-02-04-.04(1)(b). Because the Child Support Guidelines are based on an income shares model, the Child Support Worksheet requires input of, among other things, each parent's gross income. Tenn. Comp. R. & Regs. 1240-02-04-.03, -.04(3). "Determining a party's income is a question of fact that 'require[s] careful consideration of all the attendant circumstances.'" *Robeson v. Robeson*, No. M2023-01449-COA-R3-CV, 2025 WL 368233, at *7 (Tenn. Ct. App. Feb. 3, 2025) (quoting *Richardson*, 189 S.W.3d at 726).

Here, the final decree of divorce states that Wife's "income for purposes of child support shall be calculated using her income from [her primary job] solely," without including any freelance earnings. Wife testified that she worked 40 hours per week at her primary job and earned $23 per hour. According to Wife, "[t]his would put her income at $3,986 per month." However, the trial court input gross monthly income of $4,160 into

- 12 -

the Child Support Worksheet. Husband concedes that Wife "is correct in her assertion that her monthly income [for] child support purposes is $3,986." He adds that the error in calculating child support resulted from inadvertently "using $24 per hour rather than $23 per hour."

We have previously modified a child support order where the trial court made only a "mathematical error." *State ex rel. Williams v. Woods*, 530 S.W.3d 129, 145 (Tenn. Ct. App. 2017). Here, inputting the agreed-upon $3,986 for Wife's income into the Child Support Worksheet, instead of the $4,160 that the parties agree was error, results in an order that Wife pay to Husband $597 monthly in child support. We therefore modify the permanent parenting plan order to reflect that Wife's gross monthly income for child support purposes is $3,986 per month and that Wife shall pay to Husband as regular child support the sum of $597 monthly.

V.

We turn next to Wife's challenge to the division of the marital estate. *See* Tenn. Code Ann. § 36-4-121(a)(1) (effective July 1, 2017 to March 30, 2022) (requiring the court to equitably divide the marital property of the divorcing parties). While conventional arguments with regard to marital estate distribution tend to touch upon purported misclassification of property or purported inequitable distribution of the property, here, Wife challenges the trial court's ruling at a foundational level. She argues that "[t]here was no valuation of the property or debt. There was no analysis of the property under the [statutory] factors. This is an abuse of discretion." She concedes the trial court valued the marital home and that she does not dispute the trial court's valuation thereof. However, beyond the home, she notes that the trial court's order is devoid of any valuation of the property. She notes a failure to address Husband's reenlistment bonus; Husband's use of $20,000 to pay off the debt on his vehicle, while leaving the debt on Wife's vehicle; and Husband's admitted removal of funds from a joint account into an account in his name, which Wife contends amounted to 100,000 dollars and which she asserts was hidden from her.

Husband does not contend that the trial court properly valued the property in the marital estate or that the trial court made appropriate findings or applied the applicable statutory factors for consideration in equitably distributing a marital estate. Husband instead relies upon a waiver argument. He asserts Wife waived this issue based upon her failure to include a Tennessee Court of Appeals Rule 7 table.

Rule 7 provides as follows:

(a) In any domestic relations appeal in which either party takes issue with the classification of property or debt or with the manner in which the trial court divided or allocated the marital property or debt, the brief of the party raising

the issue shall contain, in the statement of facts or in an appendix, a table in a form substantially similar to the form attached hereto. This table shall list all property and debts considered by the trial court, including: (1) all separate property, (2) all marital property, and (3) all separate and marital debts.

(b) Each entry in the table must include a citation to the record where each party's evidence regarding the classification or valuation of the property or debt can be found and a citation to the record where the trial court's decision regarding the classification, valuation, division, or allocation of the property or debt can be found.

(c) If counsel disagrees with any entry in the opposing counsel's table, counsel must include in his or her brief, or in a reply brief if the issue was raised by opposing counsel after counsel filed his or her initial brief, a similar table containing counsel's version of the facts.

Tenn. Ct. App. R. 7.

At oral argument, this court questioned Wife's counsel regarding the absence of a Rule 7 table. Though Wife's counsel conceded that the trial court valued the marital home, as Wife had noted in her brief, Wife's counsel also pointed to the inherent challenge in creating a Rule 7 valuation table where the trial court did not value the property of the marital estate.[4]

Husband is correct that non-compliance with Rule 7 may be grounds for waiver. *See e.g. Harden v. Harden*, M2009-01302-CA-R3-CV, 2010 WL 2612688, at *8 (Tenn Ct. App. June 30, 2010). "However, this court exercises a preference to decide issues upon the merits and may in its discretion consider an issue despite a party's failure to include a Rule 7 table, especially where the table would be of little value to the determination of the issue and where the appealing party provides citation to the record supporting their argument elsewhere in their brief." *Bailey v. Bailey*, No. M2022-01467-COA-R3-CV, 2025 WL 1517411, at *8-9 (Tenn. Ct. App. May 28, 2025); *see e.g. Green v. Green*, No. M2011-00840-COA-R3-CV, 2012 WL 2389607, at *3 (Tenn. Ct. App. June 25, 2012) (exercising discretion to consider property division despite Rule 7 violation where the table would have been of little value given the trial court's failure to classify marital and separate property and where appellant provided relevant citations to the record elsewhere in their

---

[4] We note any deficiencies by the trial court regarding valuation do not actually prevent Wife from generating a table delineating the separate and marital property and the separate and marital debts presented before the trial court as to which she is asserting error in failing to value entirely or properly on appeal. Nor would any deficiencies as to the trial court's findings as to valuation prevent Wife from indicating what evidence she presented to establish valuation. In other words, the challenges noted by Wife's counsel point toward an explanation for an incomplete table but not an entirely absent one. Wife did, however, in her brief cite to the record with regard to specific property as to which she had concerns as to lack of valuation.

brief and also noting "our preference that cases be decided on the merits"); *Dilley v. Dilley*, M2009-02585-COA-R3-CV, 2011 WL 2015395, at \*9 (Tenn. Ct. App. May 23, 2011) (exercising discretion to consider property division despite Rule 7 violation and despite voluminous record given "our preference that cases be decided on the merits"); *Wells v. Wells*, W2009-01600-COA-R3-CV, 2010 WL 891885, at \*4 (Tenn. Ct. App. Mar. 15, 2010) (exercising discretion to "suspend the requirements" of Rule 7 even though the court consequently had to conduct a "tedious and meticulous review of the parties' briefs and the record" and noting "[t]he intent of the Rules is for all cases to be decided on the merits if possible"); *Collins v. Collins*, W2008-02660-COA-R3-CV, 2009 WL 3103821, at \*4 (Tenn. Ct. App. Sept. 29, 2009) (same); *see also* Tenn. Ct. App. R. 1(b) ("For good cause, including the interest of expediting a decision upon any matter, this Court, or the panel assigned to hear a particular case, may suspend the requirements or provisions of any of these rules in a particular case on motion of a party, or on its own motion, and may order proceedings in accordance with its discretion.").

Here, Wife made core foundational process challenges to the division of a marital estate under Tennessee law. She asserted the trial court failed to make determinations as to valuation of marital property, failed to apply the applicable statutory factors, and failed to explain its reasoning. The trial court's final order on its face is supportive of Wife's argument, and she provides citations to the record regarding property of particular concern. Given the nature of her argument while also remaining mindful of the preference that cases be decided on the merits, we exercise our discretion to consider the issue despite Wife's non-compliance with Rule 7. We caution, however, that our holding should not be construed as setting forth a general rule that a party may be routinely excused from the requirements of Rule 7. *See Green*, 2012 WL 2389607, at \*3 & n. 4 (citing *Wells*, 2010 WL 891885, at \*4).

"Trial courts divide a couple's marital estate using a four-step process: identification, classification, valuation, and distribution." *Henry v. Henry*, No. M2024-00030-COA-R3-CV, 2025 WL 304573, at \*7 (Tenn. Ct. App. Jan. 27, 2025). According to Wife, the breakdown in the present case occurred after the classification step. We have previously stated:

> Once property has been classified as marital property, the court should place a reasonable value on property that is subject to division. After this valuation, the trial court is to divide the marital property in an equitable manner considering the statutory factors listed in Tennessee Code Annotated section 36-4-121(c).

*Trezevant v. Trezevant*, 568 S.W.3d 595, 606-07 (Tenn. Ct. App. 2018) (citations omitted).

This court has observed that "Tennessee law is clear that '[t]rial courts must place a reasonable value on marital property that is subject to division.'" *Artry v. Artry*, No.

W2020-00224-COA-R3-CV, 2022 WL 4372775, at *5 (Tenn. Ct. App. Sept. 22, 2022) (quoting *Kraus v. Thomas*, No. M2012-00877-COA-R3-CV, 2013 WL 2612458, at *10 (Tenn. Ct. App. June 7, 2013); *Jacobsen v. Jacobsen*, No. M2012-01845-COA-R3-CV, 2013 WL 1400618, at *9 (Tenn. Ct. App. Apr. 5, 2013)). We have also noted the mandatory nature of applying the statutory factors for determining the proper distribution of the marital estate.[5] *Hill v. Hill*, 682 S.W.3d 184, 202 (Tenn. Ct. App. 2023); *see also*

---

[5] At the time Mr. Ewald filed for divorce, the statute listed the following factors:

(1) The duration of the marriage;

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5)(A) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(B) For purposes of this subdivision (c)(5), dissipation of assets means wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed;

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) In determining the value of an interest in a closely held business or similar asset, all relevant evidence, including valuation methods typically used with regard to such assets without regard to whether the sale of the asset is reasonably foreseeable. Depending on the characteristics of the asset, such considerations could include, but would not be limited to, a lack of marketability discount, a discount for lack of control, and a control premium, if any should be relevant and supported by the evidence;

(11) The amount of social security benefits available to each spouse; and

- 16 -

*Brown v. Brown*, 913 S.W.2d 163, 168 (Tenn. Ct. App. 1994) ("Trial courts have wide latitude in fashioning an equitable division of marital property. Their decisions must be guided by the factors in Tenn. Code Ann. § 36-4-121(c) . . . ." (citations omitted)) Addressing deficiencies in a trial court's findings in connection with assessing the distribution of the marital estate under the statutory factors, we have noted the following:

> [A]lthough the trial court made certain factual findings that were relevant to an analysis of some statutory factors, the court failed to consider or omitted other factors. The trial court's order lacks a concerted analysis of the statutory factors or a discussion of their applicability. In addition, the court's order lacks values assigned to certain assets. As a result of these omissions, we are unable to adequately assess the trial court's overall marital property distribution to determine whether it is equitable. We therefore have no choice but to vacate the marital property distribution and to remand this matter to the trial court with instructions for the trial court to "make specific findings of fact and conclusions of law in accordance with Tennessee Code Annotated § 36-4-121(c) and Tennessee Rule of Civil Procedure 52.01." [*Leonard v. Leonard*, No. W2018-02235-COA-R3-CV, 2020 WL 1515951, at *4 (Tenn. Ct. App. Mar. 30, 2020)].

*Hill*, 682 S.W.3d at 205.

Accordingly, we vacate the judgment of the trial court as to the distribution of the marital estate and remand for valuation and distribution in accordance with the statutory factors as well as for findings that elucidate the trial court's decision.

VI.

Wife also argues that the court erred in denying her post-trial motion to hold Husband in contempt for allegedly interfering with her parenting time with her child from a prior relationship. The entirety of Wife's argument on appeal is as follows: "In a one-page order, and without testimony or reasons given, the Trial Court summarily denied [the] Motion. This is clearly an abuse of discretion. Some form of testimony or reasoning must be given."

We have repeatedly held that "[i]t is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her." *Sneed v. Bd. of Prof'l Resp. of Supreme Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010). Thus, where "a party fails to

---

(12) Such other factors as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-4-121(c) (effective July 1, 2017, to March 30, 2022).

develop an argument in support of his or her contention or merely constructs a skeletal argument," as Wife has done here, "the issue is waived." *Id.*

VII.

Wife also asserts that the trial court erred in declining to award her alimony. It is well established that a trial court's decision regarding spousal support is factually driven, so we are "disinclined to second-guess a trial judge's spousal support decision" absent an abuse of discretion. *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011) (quoting *Kinard v. Kinard*, 986 S.W.2d 220, 234 (Tenn. Ct. App. 1998)). As the Tennessee Supreme Court has explained,

> An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice. *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011); *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010). This standard does not permit an appellate court to substitute its judgment for that of the trial court, but "'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,' and thus 'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.'" *Henderson*, 318 S.W.3d at 335 (quoting *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)). Consequently, when reviewing a discretionary decision by the trial court, such as an alimony determination, the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision. *Wright*, 337 S.W.3d at 176; *Henderson*, 318 S.W.3d at 335.

*Gonsewski*, 350 S.W.3d at 105-06.

Tennessee courts have repeatedly explained that, of these factors, "[t]he two most important factors considered are the need of the disadvantaged spouse and the obligor spouse's ability to pay." *Bratton v. Bratton*, 136 S.W.3d 595, 604 (Tenn. 2004); *Gonsewski*, 350 S.W.3d at 110. In fact, the "threshold consideration" in an alimony determination is the need of the disadvantaged spouse. *Ellis v. Ellis*, 621 S.W.3d 700, 706 (Tenn. Ct. App. 2019) (citing *Riggs v. Riggs*, 250 S.W.3d 453, 457 (Tenn. Ct. App. 2007)). The Tennessee Supreme Court has described "the real need of the spouse seeking the support" as "the single most important factor" in the analysis. *Gonsewski*, 350 S.W.3d at 115 (quoting *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995)). Thus, even where there

exists evidence of disparity in the parties' income or an ability to pay, our Supreme Court has found denial of alimony appropriate where the party seeking alimony "has not demonstrated that [he or she] is in need of additional financial assistance in order to adjust to the economic consequences of [his or her] divorce." *Id.* The Tennessee Supreme Court has also found denial of alimony appropriate where "the record contains no evidence at all regarding [the disadvantaged spouse's] expenses" nor any evidence of a "demonstrated need for support." *Mayfield v. Mayfield*, 395 S.W.3d 108, 119 (Tenn. 2012). "A spouse's need for alimony must be established by proof. Indeed, absent evidence regarding need, as well as the other factors pertinent to the parties' circumstances, alimony should not be awarded." *Id.* at 120.

Here, Wife introduced no evidence of financial need beyond speculation as to the costs of her regular mortgage and utility bills, which Husband paid. She testified as to her uncertainty as to those estimates. Furthermore, Wife did not submit any evidence demonstrating past or current expenses. She did not submit an income and expense statement, nor did she provide financial documentation, such as bills or receipts, to demonstrate financial need. However, she presented evidence of an income of $23 per hour at a rate of 40 hours per week, with occasional additional freelancing work at a rate of $17 per hour.

On appeal, Wife has not pointed to any part of the record demonstrating evidence of her financial need. As support for her alimony request, she refers to Husband's financial affidavit as evidence of his ability to pay, to her history as a caregiver for the children, to her diverse employment history, to a past knee surgery, and to a statement regarding minimal personal retirement savings. Wife had the burden to offer proof establishing the nature of and the extent of her need for alimony. This she has not done. Accordingly, we cannot find the trial court abused its discretion.

VIII.

For the aforementioned reasons, we modify the decision of the Chancery Court for Montgomery County regarding the award of child support, and we vacate the trial court's judgment with regard to the distribution of the marital estate. We, otherwise, affirm the trial court's judgment. Costs of this appeal are taxed equally to the appellant, Tetyana Ewald, and the appellee, Daniel Ewald, for which execution may issue if necessary. The case is remanded for such further proceedings as may be necessary and consistent with this opinion.

s/ Jeffrey Usman
JEFFREY USMAN, JUDGE

- 19 -